Argo *v.* Goodstein, Appellant.
Argo *v.* Good Company, Inc., Appellant.

Reargued January 16, 1967. Before BELL, C. J.,
MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROB-
ERTS, JJ.

*Robert B. Surrick,* with him *Cramp and D'Iorio,* for appellants.

*Garland D. Cherry,* with him *Kassab, Cherry, Curran & Archbold,* for appellee.

*William Taylor, Jr.,* for amicus curiae.

OPINION BY MR. JUSTICE COHEN, March 14, 1967:

This is a trespass action in which appellee, a blind man, seeks to recover damages for injuries sustained as a result of a fall. We heard argument on this matter, but allowed reargument because we had failed to consider at length a question which has been a determining factor in three recent decisions of this Court. That question is whether a new trial should be granted because of a secret communication between judge and jury without the presence of counsel.

The instant jury retired for deliberations at 10:37 a.m. on May 19, 1964. After breaking for lunch, the jury at 2:00 p.m. sent the following note to the trial judge: "Judge Catania: We have made a verdict and we would like to know if the same figure goes on both verdict papers or do we split the amount?" The trial judge replied in the following writing: "If you find Defendant 'A' negligent then you have a duty of fixing the extent of 'A's' liability. If you find Defendant 'B' also negligent then you must fix the damages to which the Plaintiff is entitled from Defendant 'B'". At the very time that this communication occurred counsel for appellants was present in the trial judge's courtroom engaged in the trial of a different case. Yet the judge made no effort to inform counsel of the transfer of notes.

Counsel first learned of the secret instruction when the following occurred after the jurors filed into the courtroom with their verdict: "(At 3:07 P.M. the Jury

returned to the Court Room.) The Court: May I have the note that I sent back out to you. Maybe it would be a good idea if the Jury went back and picked up the note and came back in again. And we will wait until you do. (The Jury retires from the Court Room at 3:09 P.M.) (The Jury returns to the Court Room at 3:10 P.M.) The Court: All right. May I have the note; I would like to make this part of the record. At 2:00 P.M. the Jury sent out the following note addressed to me. 'Judge Catania: We have made a verdict and we would like to know if the same figure goes on both verdict papers or do we split the amount?' And the answer I sent back: 'If you find Defendant "A" negligent then you have a duty of fixing the extent of "A's" liability. If you find Defendant "B" also negligent then you must fix the damages to which the Plaintiff is entitled from Defendant "B".' Then I signed it. All right, will you take the verdict. The Clerk: Members of the Jury, have you agreed upon a verdict? The Forelady: We have. The Clerk: What is your verdict?" The forelady immediately read the verdict and the jury was dismissed. Thereafter, counsel for appellants cited the secret instruction as error in appellants' motion for new trial.

The law in this Commonwealth is clear. Any intercourse between the trial judge and deliberating jury, no matter how innocuous, had in the absence of counsel mandates the grant of a new trial even in the absence of prejudice to either party. *Yarsunas v. Boros,* 423 Pa. 364, 223 A. 2d 696 (1966) ; *Kersey Manufacturing Co. v. Rozic,* 422 Pa. 564, 222 A. 2d 713 (1966) ; *Gould v. Argiro,* 422 Pa. 433, 220 A. 2d 654 (1966). It is by no means a novel concept that after the jury have retired to deliberate on their verdict any communication between them and the trial judge in the absence of counsel for the parties is reversible error. This was the holding of *Bunn v. Croul,* 10 Johns. R. 239 (N.Y.

1813), and *Sargent v. Roberts,* 1 Pick. 337 (Mass. 1823). Indeed, our own Court recognized this principle in *Sommer v. Huber,* 183 Pa. 162, 38 Atl. 595 (1897), wherein a new trial was awarded because the trial judge returned a written answer to the jury's request for instructions without the presence of counsel.

As we indicated in *Yarsunas, Kersey,* and *Gould,* the rule enunciated by us is and must be prophylactic. The unsavory overtones of clandestine instructions from judge to jury are so obviously unfair to judges, lawyers and litigants that no other approach than an absolute prohibition is warranted. To approach this problem on an ad hoc basis, as some members of this Court have advocated, is to expose the judicial system to baseless speculation by the general public as to the honesty and integrity of its members. I can cite no more appropriate language than the words of Chief Justice BELL, speaking for a unanimous Court in *Glendenning v. Sprowls,* 405 Pa. 222, 174 A. 2d 865 (1961), to the effect that: "It has been wisely stated that 'next to the tribunal being in fact impartial is the importance of its appearing so': Shrager v. Basil Dighton Ltd., (1924) 1 K.B. 274, 284. This applies in a special way to the Judge and his relationship with the jury. Without doubting the worthy motives or the well-intentioned solicitude of the Judge for the wishes and welfare of the jurors, private communication by a Judge to or with the jury in the jury room and in the absence of counsel is almost certain to create suspicions and a belief of unfairness in the minds of many people. It opens wide the door to possible fraud and to unintentional or possibly intentional influence of a jury and thus impairs confidence in the Court: Sommer v. Huber, 183 Pa. 162, 167 (1897), 38 A. 595." (405 Pa. 224, 174 A. 2d 866.) At the conclusion of his opinion in *Glendenning,* the Chief Justice stated: "We cannot safe-

ly leave a Judge's intrusion into a jury room to a consideration of his motives, or the language of a Judge's private communication to the memory or to the subsequent recollection or interpretation of the trial Judge and a possibly different recollection or interpretation thereof by jurors. *We strongly condemn* any intrusion by a Judge into the jury room during the jury's deliberations, or *any communication by a Judge with the jury without prior notice to counsel,* and such practice must be immediately stopped!" (Emphasis supplied). (405 Pa. 226, 174 A. 2d 867.)

In effect, *Glendenning* sets forth a prophylactic rule with reference to *"any communication* by a Judge with the jury without prior notice to counsel," with special reference to intrusion into the jury room. The majority of this Court can see no reason that the prophylactic rule established in *Glendenning* should not be applied to the situation now before us. Accordingly, we applied that rule in *Yarsunas, Kersey,* and *Gould,* and we apply it again in the instant case.

Judgments reversed and new trial granted.

———

DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:

I dissent.

Statements by a Judge to a jury in the absence of counsel, and in answer to a jury's request, do not constitute reversible error or justify a new trial, unless the communication from the Judge amounted to an instruction to the jury, as that term has always been used and understood, and constituted prejudice to one or both of the parties. *Yarsunas v. Boros,* 423 Pa. 364, 223 A. 2d 696 (Dissenting Opinion); *Kersey Manufacturing Company v. Rozic,* 422 Pa. 564, 222 A. 2d 713 (Dissenting Opinion); *Gould v. Argiro,* 422 Pa. 433, 220 A. 2d 654 (Dissenting Opinion).

In this particular case, the Court merely replied to the question of the jury as to whether or not their

verdict figure was to be placed on both verdict papers or to be split individually. To this the trial Judge replied: "If you find Defendant 'A' negligent then you have a duty of fixing the extent of 'A's' liability. If you find Defendant 'B' also negligent then you must fix the damages to which the Plaintiff is entitled from Defendant 'B' ". Clearly, this answer was so innocuous, and non-prejudicial, so as not to justify a new trial and thereby substantially increase litigation, which we are constantly striving to reduce.

The majority's reliance upon my Opinion in *Glendenning v. Sprowls,* 405 Pa. 222, is clearly inapposite. In every case a Judge's opinion *must* be considered in the light of and in the connection of the facts of that particular case. So considered, my Opinion in *Glendenning* is, I repeat, clearly inapposite, distinguishable and inapplicable. That was a case in which the Judge's actions could not possibly be justified, and prejudice might easily have resulted and have influenced the jury's verdict. In *Glendenning,* the Judge visited the jury room no less than six times and allowed a juror to leave the jury room in the company of the Judge to telephone the juror's allegedly jealous wife. However, the facts in that case are so dissimilar from the situation in the case at bar so as to compel a different result. For just as Mr. Argo must proceed through life blindly, so has the majority blinded justice by the order of a new trial.

Mr. Justice MUSMANNO joins in this dissenting Opinion.

———

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

Making a mountain out of a molehill, an ocean out of a rain puddle, and a prairie out of a blade of grass would be an easy task compared to what the Majority is trying to do here, namely, to make a case out of

about the most innocuous, trifling, insignificant situation that one can imagine in a courtroom.

An important lawsuit has been tried, a jury has returned a verdict, there is no argument that the verdict does not conform to the facts. Yet, this Court has ordered a retrial, hanging its order on a procedural thread so tenuous and fragile as to make the filament of a spider's web seem like a hawser in comparison. It is enough merely to read what the Majority has said, as to what happened at the trial, to see how the Majority labors mightily to bring forth a mouse.

Even in the truncated manner in which the Majority reports what happened, it is as clear as lightning dancing on the hills that there is no justification for a new trial here. But the situation is even more deplorable than it is reflected in the Majority Opinion. The Majority does not tell the whole story. It terminates the play before the last scene is enacted. The Majority script ends with the utterance of the Court Clerk: "What is your verdict?" Then the Majority says in its own words: "The forelady immediately read the verdict and the jury was dismissed."

That was not the ending at all. The jury was not dismissed after the reading of the verdict. Much happened on the stage of verdict rendition before the curtain descended with a dismissal of the jury. The Majority's account of what occurred is like the playing of Hamlet and omitting the crucial denouement of the duel between the Melancholy Dane and Laertes. Here is what the record shows, following the question of the Clerk: "What is your verdict?" And this is what the Majority, for reasons of its own, omitted from the Opinion and, worse yet, apparently failed to consider in reaching its illogical and unjust conclusion. I repeat the question: "What is your verdict?" and then reveal to the reader what the Majority has kept away from him, namely: "THE FORELADY: James Argo ver-

620

sus Sidney Goodstein, we the Jurors find a verdict in favor of the Plaintiff, James Argo, in the amount of $13,750. And also James Argo versus Good Company Incorporated, we the Jurors empaneled in the above entitled case find a verdict in favor of the Plaintiff, James Argo, $13,750. THE CLERK: Members of the Jury, harken to the verdict as the Court has it recorded. You do say in the issue wherein James Argo is the Plaintiff and Sidney Goodstein is the Defendant that you find in favor of the Plaintiff, James Argo, in the amount of $13,750. Whereas James Argo is the Plaintiff and Good Company Incorporated the Defendant that you find in favor of the Plaintiff, James Argo, in the amount of $13,750. So say you all. THE JURY: So say we all. MR. CHERRY: Before the panel is discharged, so the Court may properly mold the verdict, would your Honor ask the Foreman whether or not the amount of that verdict is the amount of the total amount figured together? THE COURT: The Forelady may answer the question. THE FORELADY: That is $13,-750 for each defendant. THE COURT: For a total amount—THE FORELADY:—$27,500. MR. CHERRY: The total verdict that the Jury has found? THE JURY: Right. THE COURT: All right."

It will be seen here that plaintiff's counsel was present and defendants' counsel does not deny he was present. Where, then, is the "secrecy" of which the Majority speaks? The Majority indulges itself in extravagant language when it says: "The unsavory overtones of clandestine instructions from judge to jury are so obviously unfair to judges, lawyers and litigants that no other approach than an absolute prohibition is warranted. To approach this problem on an ad hoc basis, as some members of this Court have advocated, is to expose the judicial system to baseless speculation by the general public as to the honesty and integrity of its members."

What was "unsavory" in this case, and on what basis may the Majority besmirch the name of trial judges by suggesting that the general public will question their "honesty and integrity?"

It will be noted that in the colloquy between plaintiff's counsel and the judge, plaintiff's counsel was aware that the judge had erroneously stated that if the jury returned a verdict for the plaintiff, it would separate the amounts each defendant would be required to pay. Plaintiff's counsel knew that where there are joint tortfeasors, each is liable in the full amount of the verdict. Hence, plaintiff's counsel asked the court to "mold the verdict."

The trial court caught almost, if not quite completely, what plaintiff's counsel was saying and asked the jury what was the total amount of their verdict, and the forelady replied: "$27,500." Plaintiff's counsel, then, in order to solidify and anchor his position, asked: "The total verdict that the jury has found?" And the forelady affirmed by saying: "Right." And then the court added its clinching approval by saying: "All right."

Now, all this happened in open court with defendants' counsel present. What occurred could not have been more open, audible and visible, if it had happened on the main street of the town, or under the klieg lights of a motion picture stage.

Defendants' counsel stood by and watched the entire performance as clearly revealed as if it were taking place within a fish bowl. On what basis, then, does the Majority use such misleading and derogatory words as "clandestine" and "secret"? A repetition of those words does not transform sunshine into darkness or above-ground actions into subterranean operations.

Later, the trial judge molded the verdict, as, from time immemorial, it had the right to do.

The Majority does not claim, or even suggest, that the defendants' rights were in any way damaged or even blemished. It mandates a new trial, with all the expense, worry, and delays that a trial entails, not to cure an injury, not to remedy a harm, not to rebuild a house that has been burned down, not to correct an injustice, but to punish the plaintiff, who happens to be a blind man and who is a wholly innocent person in this entire mise en scene.

The Majority would compel this plaintiff without sight to undergo the privation and the suffering of a new trial, groping his way through another battle in court, only so that the Majority may proclaim to the world that it is putting into effect a "prophylactic rule." To force this man who walks in perpetual darkness to enter into the labyrinthian fastnesses of another trial, when he has already once suffered that ordeal, is, in view of the absolute lack of necessity for it, nothing less than cruel punishment.

To drive the plaintiff in this case into another trial over the picayunish incident, ballooned by the Majority into imaginative terrorem, would be like requiring a patient who has undergone surgery and has thoroughly recovered from the anesthetic, the cutting, convalescing and scarring, to undergo another operation because the doctor, in performing the successful operation, wore black socks instead of blue socks.

Looking at this appeal, as an appellate court should, through the eyes of justice, and not through jurisprudential myopically technical lenses, reveals a piece of petty judicial tyranny at which reason can only revolt. But, from the viewpoint of law in all its chasteness, the situation is even worse. All the cases which the Majority cites are either distinguishable from the facts in the case at bar or are as equally wrong in principle and law as the present decision is. For instance, the Majority drags into position, as shoring against its ram-

shackly and crumbling structure of supposed rationalization, the case of *Gould v. Argiro,* 422 Pa. 433. I should think the present Majority would like to forget the Opinion the Majority wrote in the *Gould* case. In that case the jury sent to the trial judge two questions, namely, "1. 'Since this was a dual transmission truck, what gear was it in as it approached the top of the hill?' 2. 'What is the top union wage for welders?'" To each of these questions, the trial judge answered simply: "You must remember the testimony as given by the witnesses on the witness stand."

Short of smoking an opium pipe, it would be difficult to imagine the brain conjuring up a more inconsequential reply. Yet the Majority of this Court ordered a new trial, pontificating: "The error here committed, therefore, requires a new trial regardless of prejudice."

I say this is intolerably bad law and it should be repudiated before it festers into malignancy. To say that a new trial is demanded, regardless as to whether anyone has been hurt by a ruling or proceeding, is contrary to justice, reason, common sense, and declared law! This Court has stated thousands of times, and so have courts through the country, that where an error is harmless, there should not be, and there must not be a new trial.

Suppose the jury sends to the judge a note with the following question: "What time shall we break off for lunch?" And the judge, without calling in counsel, sends back a note with the two words: "Twelve o'clock." According to the Majority ruling in *Gould v. Argiro,* and its ruling today, a new trial would have to be ordered because the judge did not call in counsel to confer with them as to the time the jury might munch on a sandwich and swallow a piece of pie. I would say that the judge who would assemble tipstaves, clerks, and sheriffs and have them scurry

through the courthouse, into lawyers' offices and the public square to look for lawyers so that they might convene with the judge to discuss the time the jury should bend over a bowl of soup, should have his head examined, regardless of the pompous declaration by the Majority that "the rule enunciated by us is and must be prophylactic."

The meaning of prophylactic is the preventing of, and guarding from disease. The most serious ailment afflicting the courts of Pennsylvania today is the enormous backlog of cases which denies litigants an early adjudication of their causes. It is properly said that justice delayed is justice denied. And how does the Majority intend to treat this disease of backloggism? By *adding* to it! The Majority would order the retrial of cases for trivialities, inanities and appellate sophistry, quibbling and tergiversation. The Majority would order the ponderous machinery of a retrial so that it could break a butterfly on the wheel.

The Majority Opinion quotes Chief Justice BELL in the case of *Glendenning v. Sprowls,* 405 Pa. 222, and says that it "can cite no more appropriate language" than that spoken by our Chief Justice in that case. But the Majority does not point out what the Chief Justice saw when he spoke as he did. The language of a Marc Antony at a Caesar's funeral cannot be quoted as authority for a referee at a football game. To cite the *Glendenning* case in support of the Majority's far-fetched thesis, is like citing Webster's Reply to Hayne at a bingo controversy. Let us look at *Glendenning* to see how much it resembles the facts in the case at bar. The *Glendenning* case had absolutely nothing to do with a judge sending a message to the jury. In that case the judge physically went into the jury room. And not only once. While the jury was deliberating, he entered into their sanctuary of deliberation six different times! On one of these visits

he spoke to a juror and escorted him to the telephone so that the latter could talk to his wife. In explaining how it came about that he almost turned the passage between his chambers and the jurors' quarters into a revolving door, the judge related that he went into the jury room to provide the jurors with a pitcher of water; to arrange for a ride home for a juror; to tell the jury to refrain from arguing too loudly because they might be overheard; to allow a juror to leave the jury room and telephone his jealous wife( !) ; and to tell a juror that it was none of the jury's business when a juror asked him if insurance had anything to do with the case. Short of swinging a hammock in the jury room and undulating in it to the rhythm of the jury's animated discussions, it is difficult to visualize a more companionable association between judge and jury than in the *Glendenning* case where the judge played water boy, transportation clerk, and heart salver.

I sat on the appeal in the *Glendenning* case and I approved of the order for a new trial because a new trial was imperative, not because of any fanciful reason as stated by the Majority in this case but because the litigants in that case had not received a fair jury trial.

When the Chief Justice said in *Glendenning* that "We strongly condemn any intrusion by a Judge into the jury room during the jury's deliberations, or any communication by a Judge with the jury without prior notice to counsel," he obviously meant any communication which affected the orderly processes of deliberation, reflection and weighing of the evidence. The Chief Justice never meant that if a judge, not in the presence of counsel, notifies the jury that their dinner on a Thursday will consist of roast beef and gravy that such notification of menu would derail the engine of justice.

The Majority here cites several other cases, all wholly inapplicable to the facts in the case at bar. In the case of *Kersey Manufacturing Co. v. Rozic,* 422 Pa. 564, the judge gave an instruction to the jury which was not made part of the record. Five months after the rendering of the verdict, the note which presumably contained the judge's message to the jury was incorporated into the record. The facts here are wholly different. Here, the questions and answers were made part of the record in the presence of both counsel and, indeed, at the very moment the verdict was recorded.

In the case of *Yarsunas v. Boros,* 423 Pa. 364, the jury sent to the judge the following query: "Are these attorneys from Insurance Co.'s or are they personal Attorneys? If these are personal contingency lawyers should we take attorney's fee into consideration?" Questions of this seriousness referring specifically to the attorneys obviously called for the presence of the attorneys. Again, I state, there is nothing like that in the present case.

In *Sommer v. Huber,* 183 Pa. 162, also cited by the Majority here, the judge sent an instruction to the jury, but there was no record of it. Our Court said: "The communications between the judge and the jury were not preserved, and there was nothing on the record to give notice of them." The difference between that case and the one at bar is the difference between the North Pole and the South Pole, because in our case we not only have the communication but it was read in open court, in the presence of the jury and both counsel.

Then the Majority asks the reader to travel to New York into the distant past of 1813. I dislike being taken on such an archaic journey when I can stay in the twentieth century and be guided by the words of the Chief Justice spoken for a unanimous court in 1961. Nevertheless, just to show the reader that there

is not one sound legal proposition in the whole Majority Opinion, I will undertake to travel by stage coach back to *Bunn v. Croul,* 10 Johns. R. 239, decided in New York in 1813. In that case the jury asked the judge whether a particular point of evidence had been given. The judge replied that that evidence had been given and mentioned the witnesses who had so testified. A new trial was ordered and, properly so, because the judge was actually instructing the jury ex parte on the facts, in absence of counsel. There is nothing like that in the case at bar.

If I travel back to New York as it was in 1813, I suppose I may as well also hit the turnpike of history back to 1823 in Massachusetts and look into the dusty records of the case of *Sargent v. Roberts,* 1 Pick. 337 (Mass. 1823), another case the Majority shovels in without any enlightenment as to what it decides or says. In that case the jury informed the judge that they were unable to agree and asked to be discharged. The judge wrote them a letter telling them that he was unwilling, "after so much time had been consumed in the cause, to permit them to separate, and giving such directions as would enable them to reconsider the cause in a more systematic manner." This, of course, amounted to active participation in the jury's deliberations, in the absence of counsel, and a new trial was ordered. Again, it must be apparent that the situation in the case at bar is housed in a building of a different color.

I have now reviewed every citation presented by the Majority and I find not one any more controlling, on facts and on principle, to our present case than the Rule in Shelley's Case.

Finally, the Majority says that it would be wrong to consider, on an ad hoc basis, situations such as the one which has arisen in this case. This is about the wrongest thing the Majority has said in its entire dis-

cussion. What is wrong with ad hoc? Isn't the very nature of an appeal, an ad hoc deliberation? Isn't every case tried in court tried on the basis of ad hoc?

All our decisions are ad hoc. An appellate court does not operate on an assembly line basis. The decision of an appellate court is not supposed to operate like a megathon bomb, levelling the just and the unjust in its nuclear devastating explosion. Judges on the appellate courts are supposed to use some marksmanship and to aim with a precision weapon, targeting specific errors and specific acts of injustice or impropriety in the record.

I was awarded the Expert Pistol Shot Medal in the Navy during World War II, and I will say that, speaking as an expert in small arms, there is not an argument in the Majority Opinion that can not be knocked over, so far as logic and elementary justice are concerned, by a twelve-year-old boy pulling the trigger of a mail order three-dollar air rifle.

I dissent.

———

SUPPLEMENTAL DISSENTING OPINION BY MR. JUSTICE MUSMANNO, March 15, 1967:

In addition to the shattering blow to established law struck by the Majority, in so unnecessarily ordering a new trial in this case, it inflicts a grievous wound to the body of justice by ordering a new trial *generally.*

As nonsensical as is the decision of the Majority in ordering a new trial because the trial judge sent to the jury a communication which harmed no one, the decision to compel a new trial on all issues, including liability, borders on sheer farce.

If there is one complaint heard more loudly than any other today about the business of the court, it is the complaint that trials are inordinately delayed on account of the so-called backlog, that is the breath-gaspingly large number of cases awaiting trial. Now,

this Court, which is duty-bound, because of its general
supervisory powers over the courts, to do everything
possible to reduce that backlog, adds another log to
the teetering pile of pending litigations by ordering a
second trial of a case which has already gone through
the interminably long procedure of listing for trial,
waiting for trial, the taking of testimony, the argu-
ment of counsel, the charge of the court, and the de-
liberation by a jury.

I have been outvoted on the proposition that there
should be a new trial at all. But, bowing to the vote
of the Majority that there should be a new trial, it is
staggeringly incomprehensible why the new trial should
go beyond the only question in issue, namely, the ef-
fect of the trial judge's communication on the question
of damages.

In the reargument before this court, not a word
was spoken or directed to the subject of liability. All
questions on liability were fully argued, developed, de-
liberated on and disposed of in the decision on the first
appeal. Why must the issue of liability be placed on
the treadmill again? To order a new trial on liability
is like fighting again an armed battle in order to give
the losing side an opportunity to win a decision al-
ready written in blood on the pages of history.

Ordering a new trial generally in this case is not
only superfluously unnecessary, but it becomes an act
of outright cruelty. The plaintiff is a blind man and
should not be compelled, when the law does not re-
quire it, to undergo the ordeal of reliving the agonizing
event of stepping into a building without a floor and
falling into a deeper darkness than he had suffered
all his sightless life.

Let us assume that the trial judge should not have
sent to the jury a note without notifying the attor-
neys, and let us assume that the error of communica-
tion was not cured by what subsequently happened (all

of which I dispute), the error, after all, referred only to the allocation of damages. The jury had passed the river of responsibility. The jury had crossed the Rubicon of responsibility for the accident, the jury had fought the battle of Gettysburg as to who should win the controversy. The Majority does not say that there was any error in the way the jury passed the river and fought the battle of liability. Nevertheless, the Majority says that the jury must swim the same river again and fight the same battle again, after the dead have been buried, the wounded have recovered and the flags of battle have been furled.

The Majority will compel the summoning of witnesses, the summoning of new jurors, the taking of testimony, it will force the whole tedious procedure of a new trial—all unfairly, brutally and cruelly, I repeat, unnecessary.

Considerable criticism is being leveled today against the courts, much of it unjustified, but the decision of this Court in the present litigation helps to lend substance to the general complaint that the courts are often unconcerned about reality and that they lose themselves in the fogs of theory, dialectics and exaggerated formalism.

Unconvincing as is the Majority Opinion that a new trial is necessary at all in this case, there is not even a shadow of a phantom in the stygian darkness of night as to why the new trial must embrace the question of liability.

The decision of the Majority compels obedience only because of the absolute arbitrary power of the Court. This, however, does not prevent a reversal of that decision in the tribunal of rudimentary law, of fundamental logic and of uncompromising conscience.

The decision of the Majority demonstrates a brazen indifference to the rights of litigants, the manifestation of a callous disregard of established laws, and its melancholy result is a slap in the face of humanity.

DISSENTING OPINION BY MR. JUSTICE ROBERTS:

I am unable to accept the majority's conclusion that this case involves a "secret communication" between judge and jury. The record is undisputed that counsel for the defendant was present in the courtroom and heard the judge place upon the record in open court, prior to the taking and recording of the jury's verdict, both the jury's written inquiry and the court's written response. Thus the majority in this case goes even further in applying its prophylactic rule than it did in *Gould v. Argiro*, 422 Pa. 433, 220 A. 2d 654 (1966); *Kersey Mfg. Co. v. Rozic*, 422 Pa. 564, 222 A. 2d 713 (1966); and *Yarsunas v. Boros*, 423 Pa. 364, 223 A. 2d 696 (1966).

I must therefore continue to express my opposition to such an unwarranted, unnecessary, and unwise rule. As is clearly demonstrated in Mr. Justice MUSMANNO's dissenting opinion in the instant case, the majority directs a retrial upon a basis unrelated to trial error, prejudice, or any other traditional concept of reversible error. I am compelled to reiterate my opposition to the automatic granting of a new trial on the basis of the Court's recently created prophylactic rule aimed at innocuous communications between judge and jury. See *Yarsunas v. Boros*, 423 Pa. 364, 368, 223 A. 2d 696, 698 (1966) (dissenting opinion); *Kersey Mfg. Co. v. Rozic*, 422 Pa. 564, 570, 222 A. 2d 713, 716 (1966) (concurring opinion); *Lobalzo v. Varoli*, 422 Pa. 5, 7, 220 A. 2d 634, 636 (1966) (concurring opinion); *Commonwealth v. Kulik*, 420 Pa. 111, 114, 216 A. 2d 73, 74 (1966) (dissenting opinion).

The majority concedes that its new rule produced this appeal. Undoubtedly it will generate many other appeals equally without merit, further burdening this Court as well as the trial courts.

I dissent.