344 A.2d 799
**COMMONWEALTH of Pennsylvania**
v.
**Harry Lee BAMBER, Appellant.**

Supreme Court of Pennsylvania.
Oct. 3, 1975.

Frederick F. Coffroth, Dist. Atty., T. G. Saylor, Jr., Somerset, for appellee.

Before EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

MANDERINO, Justice.

Appellant, Harry Lee Bamber, was indicted and tried by a jury on charges of murder, voluntary manslaughter, and involuntary manslaughter. He was convicted of voluntary manslaughter. Post-verdict motions were denied and appellant was sentenced to a term of not less than eighteen months nor more than six years in a state correctional institution. This appeal followed.

The victim of the homicide, Verdie Florence Craig, had cohabited with appellant for four and one-half to five years, living in a one-room dwelling, which was also used in connection with the appellant's business of collecting and selling scrap and junk. At the time of the homicide the victim was sixty-eight years old, and appellant was fifty-three.

The record indicates that appellant and the victim were heavy drinkers and engaged in frequent arguments. On Friday morning, June 8, 1973, the victim was seen outside the house by several neighbors. She was bleeding from the head and calling for help, loudly accusing

the appellant of striking her. One of the neighbors, Harold Dridy, testified that the victim had a scalp wound and that blood was coming out of her hair. Later that afternoon the victim got cleaned up, and some of the neighbors noted that she appeared to be all right as she was hanging clothing on the line. This was the last day that the victim was seen alive. Eight days later, her body was found, covered by a rubber mat, lying on the floor in the house in a badly decomposed condition.

From June 8, 1973, until the next Wednesday or Thursday, the appellant was seen entering and leaving the house. Neighbors who spoke with him, stated that he appeared unusually nervous and quite disturbed, but not intoxicated. He was very careful to meet visitors on the porch, locking the door behind him. Appellant explained the victim's absence by saying that she had gone to visit relatives in Virginia.

Appellant was last seen by the neighbors on June 13 or 14. On one of those days, he stopped at a nearby restaurant and told a waitress that he was going away, asking her to accompany him. The waitress testified that the appellant was not drunk, but appeared nervous. Another witness testified that she saw the appellant in front of his house at approximately 2:00 a. m., on June 16, with his truck. The body was found later that day by neighbors alerted by a stench coming from the house.

Appellant was found and arrested in West Virginia on June 20, 1973. In a tape-recorded statement made to the State Police appellant admitted hitting, or pushing, the victim with a shotgun on Friday morning, June 8. He also admitted that later that night he struck her twice across the nose and forehead with a vodka bottle, causing her to fall to the floor. He said that at first he thought that she was simply unconscious, and so went to sleep. When he awoke, and saw the victim still lying on the floor, he realized that she was dead, and placed the rub-

ber mat over her. This statement was later transcribed and introduced into evidence at appellant's trial.

The pathologist who performed the autopsy on the victim, found evidence of a wound and underlying hemorrhage on the right forehead, a linear fracture of the seventh cervical vertebra of the neck, and an anterior separation fracture, gaping to one inch and accompanied by evidence of recent hemorrhaging between the sixth and seventh cervical vertebra of the neck. He also found a separation fracture of the lower back.

The prosecution's pathologist also stated that the decedent died from a combination of injuries caused by a strong blow or blows to the body. He stated that it was possible that a blow to the forehead with a hard, blunt object could have caused the fractures; and he said that certainly this same blow or blows to the forehead, and the victim's resulting fall, would have caused the spinal fractures, especially in light of the victim's age and the brittleness of her bones. It was his medical opinion that death resulted from fractures of the neck and lower back. He also testified that the autopsy revealed that the victim had a blood alcohol content of .42% and that this percentage of blood alcohol was not sufficient to cause death.

█ Appellant first claims that the prosecution failed to prove beyond a reasonable doubt that he caused the victim's death. Reviewing the entire record, in the light most favorable to the prosecution, *Commonwealth v. Lee,* 450 Pa. 152, 154, 299 A.2d 640, 641 (1973), we find that the evidence was sufficient to sustain the jury's determination of causation.

██ Appellant argues that the evidence is insufficient to show causation because the prosecution's pathologist was not board certified in clinical pathology, anatomical pathology, neurological pathology or forensic pathology. Board certification, however, is not a legal re-

quirement if the witness otherwise qualifies as an expert. The prosecution's pathologist had been in medicine for twenty-one years, nine of which were spent in general pathology. He had spent over two years working as a forensic pathologist, and had performed over two thousand autopsies, about seven hundred of which were of decomposed bodies. At the time of trial he was employed by the coroner's office of Allegheny County as a forensic pathologist, and by the University of Pittsburgh School of Medicine, as an instructor in pathology. His background and experience were sufficient to qualify him as an expert witness.

Appellant next argues that the evidence of causation was insufficient because two expert witnesses who testified for the defense disagreed in certain respects with the prosecution's pathologist. One of these defense witnesses, Dr. William Ayres, chief pathologist at Somerset Community Hospital and Bedford Memorial Hospital, testified that the cause of the victim's death could not be stated with any medical certainty. He also testified that a blood alcohol count of more than .40% is in the lethal range. Dr. Alfred C. Rice, who also testified for the defense, is a physician on the staff of Somerset Community Hospital specializing in diagnostic radiology. He corroborated Dr. Ayres' testimony, that a blow to the face or forehead is not the kind of blow that would cause an anterior linear fracture. Both he and Dr. Ayres stated that the separation fractures occurred post-mortem (possibly caused by the operation, conducted by police after discovery of the body, of lifting it by placing straps under the victim's shoulders and lower back).

Neither Dr. Ayres nor Dr. Rice personally examined the victim; their opinions were based on medical reports. The prosecution's pathologist conducted a six-hour autopsy of the victim. Under cross-examination, both Dr. Ayres and Dr. Rice agreed that a hard blow with a hard, blunt object, coupled with a fall by one of advanced age

with brittle bones, could have produced the fractures in the neck and in the lower back.

The prosecution "has an unvarying burden of proving legal causation beyond a reasonable doubt." *Commonwealth v. Newkirk*, 455 Pa. 559, 562, 317 A.2d 216, 217 (1974). The prosecution's evidence here clearly supports the jury's finding that appellant's hitting the victim with the vodka bottle, and her resulting fall, was the direct cause of her death. At best, there exists a disagreement among the expert witnesses. The jury was free to accept the medical opinion of the prosecution's pathologist and disregard the opinions of the defense's expert witnesses.

■ Appellant next claims that the trial court incorrectly instructed the jury as to the law of self-protection. Essentially, he argues that the trial court erred in instructing the jury that the appellant's belief that he was in danger, and the appellant's belief as to the amount of force needed to protect himself, was to be measured by a standard of reasonableness. Appellant claims that under the Crimes Code, Act of December 6, 1972, P.L. 1641, No. 344, § 1, 18 Pa.C.S. § 505, the provisions of which are herein applicable, the law on self-protection now requires only that the actor *believes* he is in danger, and that the actor *believes* the force he uses is reasonable.

Section 505 of the Crimes Code reads as follows:

"The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion."

The above section, however, must be read in light of the definition in Section 501: " 'Believes' or 'belief,' Means 'reasonably believes' or 'reasonable belief.' " We have examined the judge's charge in the light of both Section 501 and Section 505 and cannot conclude that the charge

was erroneous. We have also examined other arguments made concerning the charge and find them to be without merit.

Appellant's final claim is that a trial court communication to the jury, after it began deliberation and without prior notice to or knowledge of counsel, constitutes reversible error.

The case was submitted to the jury at 4:50 p. m., Monday, October 1. At 5:00 p. m., the next day, the jury sent the following written message to the trial court:

"At 5:00 p. m., on October 2, 1973, we, the jury, feel that we are hopelessly deadlocked and unable to reach a verdict. Respectfully, Kenneth Adams, Foreman."

The trial court instructed his jury constable to inform the jury that the judge had received the message and that they should continue their work. At 8:46 p. m., that evening, the trial court informed counsel about the jury communication. Defense counsel did not object, but called the court's attention that a communication, no matter how innocuous, can be grounds for a new trial.

Appellant asserts *Argo v. Goodstein*, 424 Pa. 612, 228 A.2d 195 (1967) requires a reversal and a new trial here. In that case, we said:

"The law in this Commonwealth is clear. Any intercourse between the trial judge and deliberating jury, no matter how innocuous, had in the absence of counsel mandates the grant of a new trial even in the absence of prejudice to either party."

*Argo v. Goodstein*, 424 Pa. 612, 615, 228 A.2d 195, 196 (1967).

Quoting from *Glendenning v. Sprowls*, 405 Pa. 222, 174 A.2d 865 (1961), we also said:

"We cannot safely leave a Judge's intrusion into a jury room to a consideration of his motives, or the language of a Judge's private communication to the memory or to the subsequent recollection or interpretation of the

trial Judge and a possibly different recollection or interpretation thereof by jurors. *We strongly condemn any intrusion by a Judge into the jury room during the jury's deliberations, or any communication by a Judge with the jury without prior notice to counsel,* and such practice must be immediately stopped!" (Emphasis in original.)

424 Pa. at 616–617, 228 A.2d at 197.

In *Glendenning,* the trial judge had visited the jury room on six separate occasions during its deliberations, and on one occasion had accompanied a juror out of the room so that the juror could telephone his wife.

 We do not find the principles of *Argo* and *Glendenning* applicable to this case. The trial judge in this case acknowledged through the jury constable that he had received the jury's message, and told the jury to continue working. We are unable to consider this an intrusion into the jury's deliberations in any way. Under the circumstances of this case, we find no reversible error.

Judgment affirmed.

JONES, C. J., did not participate in the consideration or decision of this case.

ROBERTS, J., filed a concurring opinion.

ROBERTS, Judge (concurring).

In my view *Argo v. Goodstein,* 424 Pa. 612, 228 A.2d 195 (1967), was incorrectly decided, see dissenting opinions of Bell, C. J., 424 Pa. at 617, 228 A.2d at 203, Musmanno, J., 424 Pa. at 619, 228 A.2d at 198, and Roberts, J., 424 Pa. 631, 228 A.2d at 197, and is still wrong. It should be overruled. Failing that, the present case at least repudiates some of the unfortunate implications of the language employed in *Argo.*