383 A.2d 510

**COMMONWEALTH of Pennsylvania**

v.

**Raymond RICHARDSON, a/k/a, Willie Polite, a/k/a, Leroy Macke, Appellant (two cases).**

Supreme Court of Pennsylvania.

Argued Oct. 14, 1976.

Decided Jan. 26, 1978.

574

Clyde W. Waite, Bristol, for appellant.

Stephen B. Harris, 1st Asst. Dist. Atty., for appellee.

Before EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION

NIX, Justice.

On May 8, 1970, Raymond Richardson, appellant, gained entrance to the Bechter residence in Bristol, Pennsylvania, by using a ruse that he was having car trouble and needed the use of a telephone. Mrs. Jesse Bechter, aged 71, admitted him for the purpose of allowing him to use the telephone and directed him to the kitchen where the telephone was located. Appellant pulled out a gun and demanded money of Mrs. Bechter. He ordered her to lie down on the floor and when she was unable to comply because of physical infirmities resulting from a stroke, he hit her and knocked her to the floor. She was thereafter raped and stabbed by her assailant.

During this encounter, Ms. Evelyn Bechter, the daughter of Mrs. Jesse Bechter, entered the home. Mrs. Bechter testified that she saw Richardson hit her daughter as a result of which the daughter collapsed upon the floor. Evelyn Bechter subsequently died as a result of the injuries inflicted by Richardson. A search of the Bechter residence after the incident disclosed that certain pieces of jewelry had been taken from the home. This jewelry was later found to be in the possession of Hoyt Martin and Rosemary Radkin, who testified that Raymond Richardson had given these items to them.

After an intensive investigation, Raymond Richardson was arrested and charged with one count of murder, two counts of rape, two counts of robbery and burglary. A jury trial resulted in verdicts of guilty of murder of the first degree and all other charges. Motions for a new trial and in

arrest of judgment were filed and after argument, denied. This direct appeal followed.[1]

The first objection relates to an alleged improper contact between the trial judge and several of the jurors. During voir dire and after some jurors had been selected, but before a complete jury had been empanelled and sworn, it was ascertained at the close of the court day that due to an administrative error, no transportation had been arranged for those jurors already selected to transport them from the courthouse to the hotel where lodgings were to be provided for them. In an effort to alleviate the situation, the trial judge drove several of those jurors to their destination. The next day the following record was made of this incident:

"Gentlemen, we will note the presence of the defendant in Court, and I want to put on the record what I told counsel in Chambers when I called them a few moments ago, and that is this. Last night when we recessed, there was to be a bus to transport the jurors from here to, that is the jurors that had been selected, from here to the Holiday Inn in New Hope for their lodging. The Court Administrator apparently had over-looked, or forgotten it, so he informed me, and subsequently there was no bus. Mrs. Slater, one of the tipstaffs, who had the jurors in charge had her car available. The Court Administrator was still here, but I attempted to have some of the courthouse personnel who might have cars available transport them, so that the jurors would remain in the presence of either Mrs. Slater or Mr. Young, the other tipstaff who has them in charge. I couldn't arrange such transportation through the courthouse personnel. Frankly, I forgot that Doylestown had a Taxi Service, it didn't occur to me to engage Taxis to make the Transportation. Mrs. Slater, accordingly volunteered she drive some of them in her car, and Mr.

1. Judgment of sentence entered under the murder indictment is pursuant to the Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, art. II, § 202(1), 17 P.S. § 211.202(1) (Supp.1977). The remaining convictions were certified to this Court from the Superior Court.

Kester, who was here, although he had forgotten what he was supposed to do, volunteered he would drive some in his car. Mrs. Slater, I don't know how many she had with her. Mr. Young accompanied Mr. Kester in his car, and I drove three unaccompanied by any tipstaff. On the way from here to New Hope, Mr. Dwelley, who was seated beside me, asked me if I thought the case would be completed by October 22nd, saying that he did not recall Counsel telling them how long the case would be likely to last, and saying that he was expecting a visit from a friend or relative from Liverpool, England, on the 22nd of October. I told him that counsel had mentioned they anticipated a week being spent on the trial approximately, and that therefore, I would assume that the trial would be completed within a week or ten days; as counsel's estimate in the past very generally have been fairly accurate. And, consequently, I would rely on the statements made. That was the extent of any discussion concerning this case. *I would be glad if counsel wishes to interrogate any of the three jurors to have them brought back for interrogation . . .* " (emphasis added)

Counsel for the defendant declined the opportunity to examine the jurors as to the existence of any possible prejudice that may have arisen from this contact. Counsel, for the defendant, immediately moved for the withdrawal of a juror and that request was denied. This ruling is the basis for the first assignment of error.

Due process mandates that a fair trial be afforded in every cause regardless of the malevolence of the crime or the impressiveness of the evidence tending to establish guilt. *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). The touchstone of a fair trial is the mandate, "that a defendant have a panel of impartial, indifferent jurors" available to try his cause. *Murphy v. Florida*, 421 U.S. 794, 799, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). We therefore must view the instant situation to ascertain whether this conduct was so offensive that even in the absence of a showing of prejudice, fundamental fairness requires that the verdict must be disturbed.

In the sophisticated and complex society in which we live today it would be utterly unrealistic to require jurors to be persons who have been hermetically insulated from any and all exposures that might tend to influence their judgment. In considering the fact of pre-trial media coverage on the capacity of a juror to fairly discharge his or her responsibility, the United States Supreme Court has had occasion to observe:

> "It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard." (Citations omitted) *Irvin v. Dowd, supra,* 366 U.S. at 722–23, 81 S.Ct. at 1642.

Concededly, these comments were made in a somewhat different context. Nevertheless we believe they reflect an underlying rationale which is pertinent to the resolution of the instant issue. It would be jurisprudentially unsound to endorse a rule of law proscribing every circumstance, whether deliberately contrived or not, which provided an opportunity for an untoward influence to be exercised, without the necessity of establishing that there was, in fact, prejudice resulting from the event.

In appraising the nature of the instant contact and assessing what remedy, if any, may be required we must first distinguish this situation from those involving an intrusion upon a jury during their deliberations. There are a number of decisions that would suggest the appropriateness of a per se rule prohibiting any intercourse between the trial judge and deliberating jury in the absence of counsel, regardless of

how innocuous. *Argo v. Goodstein*, 424 Pa. 612, 228 A.2d 195 (1967); *Yarsunas v. Boros*, 423 Pa. 364, 223 A.2d 696 (1966); *Kersey Manufacturing Co. v. Rozic*, 422 Pa. 564, 222 A.2d 713 (1966); *Gould v. Argiro*, 422 Pa. 433, 220 A.2d 654 (1966); *Sommer v. Huber*, 183 Pa. 162, 38 A. 595 (1897). The evil sought to be addressed by this prophylactic rule appears to be the exclusion of the parties to a lawsuit during a segment of a trial as critical as a jury instruction. Without commenting upon the legitimacy of such a rule,[2] it is readily apparent that it is distinguishable from the question presented here where the *sole concern* is whether the exposure adversely affected the accused and thereby denied him a fair trial. The fact that the instant contact was unquestionably apart from the actual trial process renders the foregoing authority inapplicable.

A closer parallel may be drawn to those cases where a prophylactic rule has been employed in instances where the challenged exposure did not constitute an integral part of the trial itself. A close analysis of these decisions satisfies us that they are distinguishable from the instant case. In *Turner v. Louisiana*, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965), eight members of the United States Supreme Court agreed that it was a violation of due process to permit two deputy sheriffs, who were in continuous and intimate association with the jurors during the three-day trial, to testify as *key witnesses* for the prosecution. In so ruling, the Court indicated that even if it were to be assumed that these witnesses had not discussed the case directly with any members of the jury:

> it would be blinking reality not to recognize the extreme prejudice inherent in this continual association throughout the trial between the jurors and these two key witnesses for the prosecution. We deal here not with a brief encounter, but with a continuous and intimate asso-

2. In *Commonwealth v. Bamber*, 463 Pa. 216, 344 A.2d 799 (1975), this Court refused to apply the prophylactic rule where the extent of the communication between the judge and the deliberating jury was a direction to continue to deliberate after the judge had been informed by the jury that they were deadlocked.

ciation throughout a three-day trial—an association which gave these witnesses an opportunity, as Simmons put it, to renew old friendships and make new acquaintances among the members of the jury.

It would have undermined the basic guarantees of trial by jury to permit this kind of an association between the jurors and two key prosecution witnesses who were *not* deputy sheriffs. But the role that Simmons and Rispone played as deputies made the association even more prejudicial. For the relationship was one which could not but foster the jurors' confidence in those who were their official guardians during the entire period of the trial. And Turner's fate depended upon how much confidence the jury placed in these two witnesses. *Id.* at 473–4, 85 S.Ct. at 550. (Footnotes omitted)

A comparable situation faced this Court in *Commonwealth v. Stewart*, 449 Pa. 50, 295 A.2d 303 (1972). That case involved a prosecution for murder where the father of the victim was on the panel from which the trial jury was selected and had been in the same room with the jurors who were hearing the cause for as long as two and one-half days. We held in that instance that the conviction should be reversed because the accused had been denied a fair trial even if the father said nothing to the jurors about the case. Comparing the factual situation in *Turner v. Louisiana, supra*, this Court remarked in *Stewart*:

Certainly if there is "extreme prejudice inherent in this continual association," there is even more prejudice or opportunity for prejudice and bias, where the father of the victim is with the jury, confined in a room for as long as two and one-half days. During this time the subtle emotions of hate for the appellant, or pity for the father of the deceased could clearly develop, even assuming the father said nothing about the case. Moreover, if the father did say something about the case, the credibility of the appellant could have been destroyed, and his credibility was of the utmost importance to the defense since they were making every effort to reduce the degree of the

crime through the appellant's testimony when he related to the jury how the murder came about. *Id.* at 55–56, 295 A.2d 305–6.

The distinguishing feature between *Turner* and *Stewart* and the instant case is that in the former two cases the jurors' exposure was with individuals whose interest in the outcome was unquestionably antagonistic to the position of the accused. This feature is not readily apparent in the instant case. The role of a judge is that of an impartial arbiter. His principal charge as trial judge is to protect against circumstances and influences that would undermine the impartiality and objectivity of the jury. *See generally,* ABA Project on Standards for Criminal Justice, "The Function of the Trial Judge", Part I, § 1.1 et seq. (1972); "Fair Trial and Free Press", Part II, § 2.4 (1968).

The legitimacy of holding that a juror's close association with a witness, whose credibility he must ultimately ascertain, would necessarily diminish that juror's objectivity in that regard is not seriously open to question and does not require demonstration by a showing of prejudice. *Turner v. Louisiana, supra.* So too, where the jury shared a close association with an immediate family member of a deceased victim, that jury can obviously not be expected to engage in their deliberations entirely free of the impressions and emotions inspired by that relationship. *Commonwealth v. Stewart, supra.* In contrast, where the association has been with one who is impartial, there is no basis for concluding that any fondness, friendship or respect that might result will inure to the benefit of either party to the controversy. Further, we believe it would be unjust to our judiciary, in absence of evidence demonstrating the fact, to presume that a jurist ignored this responsibility and neglected to maintain the air of impartiality. Having declined to accept either of the foregoing presumptions, it necessarily follows that there is no basis upon which to formulate the rule requested by this appellant, which would permit him relief without any indication of injury to his cause.

Appellant urges that the presumption is appropriate because a requirement that prejudice must be demonstrated would place the court in a position of passing upon his own wrongdoing. The initial fallacy in this reasoning is that it assumes wrong-doing on the part of the trial judge. While the contact with the jury may well have been imprudent, it cannot be said that his acts were illicit without testimony establishing the illegality. As to the capability of our trial judges to review charges of abuse of their discretion, the law is replete with instances where this responsibility has been conferred upon them. We are satisfied that the instant claim falls within the class of cases wherein a motion to declare a mistrial merely because there was an *opportunity* to influence a juror is deemed to be within the sound discretion of the trial judge. *Commonwealth v. Truitt*, 369 Pa. 72, 85 A.2d 425 (1951); *Commonwealth v. Craven*, 138 Pa.Super. 436, 11 A.2d 191 (1940). Here, for the reasons stated, the trial court did not abuse that discretion by denying the motion.

Appellant next challenges the introduction into evidence of a fingerprint, alleged to have been his, which was found on a doorjamb in the victim's home. He argues that since he had been taken by the police to the premises prior to the completion of the evidence-gathering it was possible that the print could have been left during his visit to the home while he was in police custody. He insists that in view of this possibility and the damaging effect of this evidence, his right against self-incrimination and due process was violated by the police in transporting him to the scene of the crime at the time they did.

It is true that the presence of a suspect's print at the scene of a crime is relevant to establish guilt only where his presence can be connected with the time of the commission of the offense. Thus, where the fingerprint may have been made during a nonculpable contact the probative value of fingerprint evidence is neutralized. *See, e. g., United States v. Corso*, 439 F.2d 956 (4th Cir., 1971). However, this question is one of credibility and not admissibility. There is

no question that the jury was given full opportunity to consider the possibility that the print may have been left when he was taken to the home by police officials.[3] Furthermore, appellant has not here objected to the admission of the fingerprint evidence,[4] but rather argues that the police's conduct in taking him to the scene prior to the completion of the evidence-gathering was violative of his constitutional rights. Apparently recognizing the futility of a challenge to the introduction of the evidence itself, appellant seeks to accomplish the same end by implicitly urging that we find the police conduct so offensive as to justify the application of the doctrine of exclusion.[5] Such a transparent subterfuge obviously must be rejected.

■ Appellant next complains of the opportunity offered to him to challenge the array of the grand jury. It is conceded that the principles set forth in *Commonwealth v. Collemacine*, 429 Pa. 24, 239 A.2d 296 (1968) and *Commonwealth v. Dessus*, 214 Pa.Super. 347, 257 A.2d 867 (1969)

---

**3.** Additionally, appellant argues that he was unduly restricted in the cross-examination of Detective Ziemba, the officer who extracted the latent print. Defense counsel, in the cross-examination of the detective, attempted to elicit from him the fact that the defendant had been brought to the premises and handled the doorjamb in question prior to the detective's removal of the print. It was clear, however, that the detective did not have personal knowledge of when the defendant actually visited the scene. The court therefore properly prevented trial counsel from attempting to elicit hearsay from this witness. The information as to when the defendant was taken to the scene and the relationship of that visit with the examination by Detective Ziemba was fully established by other witnesses who did in fact have personal knowledge of the event.

**4.** Appellee, in his brief, properly notes that appellant could not, at this time, even if he had chosen to do so, raise the question of the admissibility of the fingerprint testimony since that objection had not been properly preserved for review because of the failure to raise it by way of a pre-trial suppression motion. *See* Pa.R.Crim.P. 323(b).

**5.** It is to be noted that appellant has not expressly requested the exclusion of the fingerprint testimony but rather merely asserts the deprivation of his right against self-incrimination and due process. However, if the challenge was successful it is obvious that in a re-trial, the only way to remedy the complaint would be the suppression of the incriminating evidence which resulted from the asserted illegality.

were not in any way violated. Instead, he seeks to use his dissatisfaction with the succession of counsel who were appointed on his behalf and at his request as a reason for justifying a belated challenge to the composition of the grand jury that indicted him. To accede to this request would be tantamount to transforming obstreperousness into a virtue.[6]

Appellant next argues that certain jewelry taken at the time of the crime was recovered by police officials by seizures which violated Fourth Amendment requirements. Specifically, it is argued that this jewelry was recovered without a warrant and prior to the arrest of appellant. Further, it is contended that although the jewelry had been turned over to third persons, their custody was limited and that they were not empowered to consent to a police seizure of these articles. A consideration of the facts presented leads us to the conclusion that appellant had relinquished any possessory interest in the property in question and therefore his Fourth Amendment rights were in no way violated by the seizures of these items. Although there are minor discrepancies in the testimony of Hoyt and Rosemary explaining with what intent appellant had given the jewelry to them, it is clear that at least some of the items were relinquished or abandoned. One such item, an earring, was abandoned by appellant in giving it to Rosemary with the instruction to flush it down the toilet. Additionally, appellant had relinquished his interest in some of the stolen rings, evidenced by the fact Hoyt testified he purchased them from appellant. Having abandoned some of the items of jewelry, appellant lost his standing to challenge their seizures. *Abel v. United States*, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960). He cannot assert his Fourth Amendment rights vicariously through Hoyt and Rosemary because these rights are personal in nature. *Commonwealth v. Ross*, 452 Pa. 500, 307 A.2d 898 (1973). The seizure of any remaining stolen

6. Appellant alleges his inability to communicate with his various attorneys and intimates the possibility of their ineffectiveness. He, however, has not specifically raised this objection nor has he offered evidence to support such a conclusion.

items which appellant gave to Hoyt and Rosemary with the instruction to hold them for him, thereby arguably retaining his possessory interest, cannot successfully be complained of since the abandoned items would have been sufficient to link him with the crime. Any Fourth Amendment violation as to the remaining items would be harmless error beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

Next appellant contends he should have been granted his request for a change of venue based on allegedly prejudicial pre-trial publicity. The grant or refusal of a change of venue is within the sound discretion of the trial court. *Commonwealth v. Martin,* 465 Pa. 134, 348 A.2d 391 (1975), cert. denied, 428 U.S. 923, 96 S.Ct. 3234, 19 L.Ed.2d 1226. *See also, Commonwealth v. Powell,* 459 Pa. 253, 328 A.2d 507 (1974); *Commonwealth v. Martinolich,* 456 Pa. 136, 318 A.2d 680 (1974); *Commonwealth v. Yount,* 455 Pa. 303, 314 A.2d 242 (1974); *Commonwealth v. Swanson,* 432 Pa. 293, 248 A.2d 12 (1968). The factors considered in assessing whether a trial judge's discretion has been abused in denying a change of venue based on pre-trial publicity are: 1) the length of time between the publicity and the trial, 2) the nature and extent of the publicity (whether inflammatory or basically factual and how pervasively the information has been disseminated), 3) the degree to which the information is attributable to police or prosecution sources, 4) the community atmosphere, 5) the trial court's efforts to insulate the jury against and/or to diminish the impact of the publicity, and 6) the probable efficacy of a change of venue. *Murphy v. Florida, supra* ; *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Commonwealth v. Martin, supra* ; *Commonwealth v. Nahodil,* 462 Pa. 301, 341 A.2d 91 (1975); *Commonwealth v. Stoltzfus,* 462 Pa. 43, 337 A.2d 873 (1975); *Commonwealth v. Pierce,* 451 Pa. 190, 303 A.2d 209 (1973); *Commonwealth v. Hoss,* 445 Pa. 98, 283 A.2d 58 (1971). *See also, Ranney, Remedies for Prejudicial Publicity: A Brief Review,* 21 Vill.L.Rev. 819, 830–831 (1976). Appel-

lant introduced no evidence to show the atmosphere and attitude throughout Bucks County was so thoroughly charged with prejudice against the defendant that a fair and impartial trial could not be afforded to him. His evidence consisted merely of copies of the articles themselves, the circulation figures of the periodicals and population statistics of Bucks County, Bristol Borough and Bristol Township. The most recent of the articles was published a year prior to trial indicating that any prejudicial effect would probably have been abated. In addition, a review of the only article included in the record would indicate that the reported events were factually based and not of a particularly inflammatory character.[7]

Since appellant introduced no evidence of the effect of the articles at the venue hearing, and since on appeal he suggests no grounds on which to find an abuse of the lower court's discretion, we find the denial of the change of venue was proper.

Appellant's next argument alleges that the lower court erred in its charge to the jury regarding identification and the appropriate inferences and presumptions flowing from the possession of recently stolen goods. Appellant claims the lower court should have instructed that the jury could infer from Hoyt's possession that he was responsible for the larceny. The lower court properly refused appellant's requested charge regarding presumptions arising from possession of recently stolen goods by Hoyt. Initially it must be pointed out that appellant's requested charge of a presumption of guilt improperly states the law. Possession of recently stolen goods would only give rise to an inference and not a presumption of guilt. *Commonwealth v. Turner*, 456 Pa. 116, 317 A.2d 298 (1974); *Commonwealth v. Shaffer*, 447 Pa. 91, 288 A.2d 727 (1972). The inference flowing from the recent possession of stolen goods is available under

7. Although there are references to several allegedly prejudicial articles, the record presented to us in this appeal contains only one article. The article was published in the September 1970 issue of the Front Page Detective. Only 175 copies of that issue were distributed in Bucks County which had a population of 415,056 at that time.

proper circumstances where there is no direct testimony to establish the ultimate fact. Here, there was evidence introduced for the jury's consideration as to the circumstances surrounding Hoyt's gaining possession of these articles. It was left for the jury to accept or reject these explanations. In this context, the inference requested would have served no purpose. We therefore conclude that refusal of the requested point of charge was not an abuse of discretion.

 Appellant raises three additional arguments. These arguments must be rejected and do not require an extended discussion. First is appellant's objection to certain alleged improper remarks made by the prosecutor in his summation to the jury. Since these remarks were not objected to at trial they are waived and will not be considered in this appeal. *Commonwealth v. Clair*, 458 Pa. 418, 326 A.2d 272 (1972). Appellant also urges that we find his identification by the principal prosecution witness during the preliminary hearing as being unduly suggestive. The record is utterly devoid of any support for this position. Lastly, appellant challenges the issuance of a search warrant by which the Commonwealth secured certain blood and hair samples from the accused.[8] This contention rested upon the assertion that the affidavit supporting the warrant was inadequate. We are satisfied that this contention is completely without merit.

Judgments of sentence affirmed.

JONES, former C. J., did not participate in the decision of this case.

EAGEN, C. J., concurs in the result.

ROBERTS, J., filed a concurring opinion.

MANDERINO, J., dissents.

8. Appellant complains of the inadequacy of the affidavit underlying an additional search warrant but the Commonwealth did not introduce any evidence pursuant to that warrant.

ROBERTS, Justice, concurring.

There is no reasonable possibility that the contact between the trial judge and the jury could have prejudiced appellant. I therefore concur in the result reached by the Court on this issue. See *Kersey Mfg. Co. v. Rozic*, 422 Pa. 564, 570, 222 A.2d 713, 716 (1966) (concurring opinion of Roberts, J.); *Yarsunas v. Boros*, 423 Pa. 364, 368, 223 A.2d 696, 698 (1966) (dissenting opinion); *cf. Argo v. Goodstein*, 424 Pa. 612, 631, 228 A.2d 195, 197 (1967) (dissenting opinion).