372 A.2d 460

PRINTED TERRY FINISHING COMPANY, INC.

v.

CITY OF LEBANON and Pitometer Associates, Inc.

Appeal of PITOMETER ASSOCIATES, INC.

PRINTED TERRY FINISHING COMPANY, INC., Appellant,

v.

CITY OF LEBANON and Pitometer Associates, Inc.

Superior Court of Pennsylvania.

Argued March 22, 1976.

Decided March 31, 1977.

278

George E. Christianson, Lebanon, with him Lewis, Brubaker, Whitman & Christianson, Lebanon, for appellant at No. 34.

Stephen A. Cozen, Philadelphia, and Bernard A. Buzgon, Lebanon, for appellant at No. 16 and appellee at No. 34.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

PRICE, Judge:

We are confronted here with consolidated appeals of unusual complexity and length. On April 30, 1970, a fire substantially destroyed the building and machinery used by Printed Terry Finishing Company, Inc. (Printed Terry) to emboss colored designs on terry cloth towels. Eight months later, Printed Terry filed a complaint in trespass charging

the City of Lebanon (City) and Pitometer Associates, Inc. (Pitometer) with negligently causing the fire which ravaged its factory. A trial, bifurcated as to liability and damages, resulted in a jury verdict in favor of Printed Terry and against both defendants[1] in the amount of $534,249.28. On August 12, 1975, the court below denied Pitometer's motion for judgment n. o. v. or a new trial as to liability, but granted Pitometer's motion for a new trial limited to damages on the basis of alleged misconduct by record counsel for Printed Terry. In view of its determination to grant a new trial as to damages, the court below failed to consider Printed Terry's motion to mold, modify and amend the jury's verdict on damages. Both Printed Terry and Pitometer contest the propriety of the order entered by the court below.

## Pitometer's Motion for Judgment N.O.V.

■ It is fundamental that in evaluating the merits of a motion for judgment n. o. v., the testimony must be read in a light most favorable to the verdict winner. *E. g., Bailey v. Gibbs,* 414 Pa. 238, 199 A.2d 460 (1964); *Rodgers v. Sun Oil Co.,* 406 Pa. 277, 177 A.2d 491 (1962). All unfavorable evidence and the inferences deducible therefrom, if depending solely on oral evidence, must be rejected. *E.g., Rodgers v. Sun Oil Co., supra; Karan v. Pennsylvania Power & Light Co.,* 205 Pa.Super. 318, 208 A.2d 876 (1965).

On April 30, 1970, at approximately 5:40 p. m., employees noticed a small fire above the Number Two dryer in Printed Terry's plant located at Sixteenth and Willow Streets in the City of Lebanon. An employee attempted to reach the fire with a portable fire extinguisher, but failed. He did manage, however, to turn off electrical power to the dryer. All employees then fled from the building which was quickly surrounded by fire fighters. Although heavy smoke snaked skyward, no flames were initially visible from outside the

1. The case against the City was settled prior to trial when the City executed a joint tortfeasor release. The City did not participate in the conduct of the trial.

building. Anxious firemen hastily attached hoses to hydrants and thrust forward, but their hoses failed to yield the expected burst of water. Instead, only a small amount of water dribbled forth, splashing the sidewalk but falling far short of the high, heated roof. Frustrated firemen loudly clamored for water. At about 6:05 p. m., an employee of the City Bureau of Water, fortuitously aware [2] of the fire at the Printed Terry plant, opened a number of valves in the water district north of the plant. These valves had recently been closed in connection with a study of the City water system then being conducted by Pitometer. Firemen soon experienced increased water pressure, but by then, the small fire had become a conflagration.

The Printed Terry plant was not solely dependent upon firemen to prevent a fiery demise. In 1965, a "dry pipe" sprinkler system had been installed in the Printed Terry building. This system was connected to an eight-inch City water main on Sixteenth Street adjacent to the west side of the Printed Terry building. The Printed Terry "dry pipe" system contained pressurized air in its pipes, and operated in the following manner: If a sprinkler head in the Printed Terry plant encountered temperature of a certain degree, the sprinkler head would melt, thus reducing the air pressure within the pipes. Water from the City water system would then enter the sprinkler system and extinguish the fire.

The Printed Terry system was also equipped with two different automatic alarm devices. One device would transmit a signal to the Civil Defense Office in the City if some element of the system began to function abnormally. The second alarm device would sound a warning in the plant when water began to flow through the pipes. Thus, if a fire occurred, the first device would activate as air pressure lowered, indicating some trouble within the system, and the

2. David Fink, the City employee, had finished work for the day and was inside the Happy Bar in Lebanon when a person announced that a second alarm fire had broken out. Mr. Fink left the bar and proceeded to a firehouse which was one block away. At that time, he learned that the fire was at the Printed Terry plant.

second device would sound an alarm as water entered the system.

The record shows that the Printed Terry sprinkler system had recently been examined and found to be functioning properly. Specifically, an inspection of the entire sprinkler system during the first two weeks of April of 1970 had confirmed that proper air pressure existed in all pipes. This inspection further demonstrated that the sprinkler head most distant from the water inlet valve would receive water within thirty seconds after the system activated. Moreover, on April 28, 1970, only two days prior to the fire, the installers of the sprinkler system, the Capitol Radio Company, discovered, after testing, no defect in the operation of the two alarm devices. Although a signal was transmitted to the City Civil Defense Office when the fire broke out at the plant, witnesses testified that no alarm ever sounded throughout the building. Moreover, no water was seen coming from the sprinkler heads.

David J. Kinash, the Director of Water and Sewers for the City testified that prior to 1970 the City water system was losing a great deal of water each day. As a result, on March 16, 1970, the City engaged Pitometer, an engineering concern specializing in the study of municipal water systems, to conduct a "Pitometer Water Waste Survey" of the City water system. Under the terms of the survey, Pitometer, aided by a small instrument known as a pitometer, was to determine the efficiency and total consumption of the system, divide the distribution system into districts and determine the water flow into each district, locate all underground leaks of a certain size, investigate all large industrial consumers to detect unauthorized water use "through fire lines or otherwise," test all commercial and industrial meters four inches or larger in diameter, and provide the City with a detailed report of the survey at its completion. The City, on the other hand, was to "furnish and set corporation cocks at the points designated by [Pitometer] engineers, supply competent labor for operating valves and repairing leaks, construct and furnish transportation, including driver, neces-

sary for properly conducting the Survey." (R. 1170a–1171a) According to Pitometer, a further benefit to be derived from the survey would be the increased fire protection in the areas adjacent to defective valves which would either be opened or repaired during the survey.

As contracted, Pitometer proceeded with its plan to divide the City water system into various districts so that the flow of water through each district could be determined. On April 29, 1970, after discussion with several Bureau of Water employees, Pitometer decided to isolate District One by turning off numerous water valves in that district. This action resulted in a substantial diminution in the amount of water flowing into the district, immediately south of District One, in which the Printed Terry plant was located. Despite receiving reports of low water pressure in the Printed Terry district, Pitometer and the City employees again turned off the valves in District One on April 30, 1970, the day of the fire at the Printed Terry plant.[3]

Virgil Ferguson, a district manager for Pitometer, admitted that a water waste engineer should know for fire protection purposes precisely how the water pressure within a distribution district would be affected by the isolation of an adjacent district. However, Thomas K. Beane, the Pitometer field engineer who conducted the survey, testified that prior to the isolation of District One he never suggested to City officials that a determination be made of the water pressure contained within, or running to, the Printed Terry district. Similarly, Beane failed to suggest to City officials that the effect of isolating one district upon the water pressure in an adjacent district be measured. Beane further testified that he failed to notify the City Fire Department that the level of water pressure in the Printed Terry district would be greatly reduced by the isolation of District One. Beane also failed to suggest that contingency plans be established in case of fire in the Printed Terry district.

---

3. One valve previously closed was left open in response to the low water pressure reports. This valve had no effect on the water pressure available to the Printed Terry plant.

Printed Terry presented two witnesses to testify as experts. The first expert witness, Alfred Ellis Baccini, testified, in response to a hypothetical question, that the fire would have been extinguished in its incipient stage, if the Printed Terry sprinkler system had been supplied with the proper water pressure level. He also testified that Pitometer had not followed good fire protection practices during the course of its survey because it had allowed the water valves in District One to be closed without establishing contingency plans in case of a fire. The second expert witness, Horton Blackwell Rucker, testified that Pitometer failed to observe good engineering practices by not measuring what effect the isolation of District One would have on the water pressure within that district or within adjacent districts. Moreover, he testified that he had observed Pitometer conduct previous water system surveys in which the appellant had always determined what effect the survey would have on the safety of the property and the lives of customers in the areas to be surveyed and had always arranged for provisional crews to be present in the case of emergencies in critical areas.

Pitometer asserts, *inter alia,* that the instant case should have been withdrawn from the jury because no liability exists at law on the part of the City for failure to provide Printed Terry with water pressure sufficient to fight fires. If the City has no actionable duty to provide Printed Terry with adequate water pressure, then certainly, the appellant concludes, Printed Terry may not maintain a valid cause of action against it, the appellant, for fire damages caused by low water pressure. We find no merit in the appellant's argument.

Pitometer bases its argument that a municipality owes no legal duty to provide sufficient water to fight fires upon the divisiveness of opinion apparent among the justices participating in the Pennsylvania Supreme Court case of *Doyle v. South Pittsburgh Water Co.,* 414 Pa. 199, 199 A.2d 875 (1964). In *Doyle,* and its companion case, *Malter v. South Pittsburgh Water Co.,* 414 Pa. 231, 198 A.2d 850

(1964),[4] the court held that "a property owner stated a valid cause of action against a water company [and a municipality] for its failure to have its hydrants in proper working order where [it was alleged] this failure made it impossible for the fire company to extinguish the fire in time to avoid total destruction of the premises." *Githens, Rexsamer & Co. v. Wildstein,* 443 Pa. 480, 483, 277 A.2d 157, 158 (1971). Although the court in *Doyle* clearly establishes a legal duty on the part of a municipality to maintain its water system in "proper working order," *Githens, Rexsamer & Co. v. Wildstein, supra* 443 Pa. at 483, 277 A.2d at 158, the appellant urges us to rule that such a duty does not exist under the law of this Commonwealth, contending that the *Doyle* opinion failed to achieve binding precedential effect because it was joined by less than a majority of those justices participating in the decision. The appellant therefore exhorts that our determination of the instant issue is to be controlled by two cases decided prior to *Doyle, Grant v. Erie,* 69 Pa. 420, 8 A. 272 (1871), and *Thompson v. Springfield Water Co.,* 215 Pa. 275, 64 A. 521 (1906), in which the court held that the failure to supply water for fire protection purposes is not in itself actionable. After careful review and reflection, we hold that the existing law of this Commonwealth recognizes that a municipality has a legal duty to maintain the proper functioning of its water system. Moreover, even if we were to find ourselves not bound by the opinion of the court in *Doyle,* we find the rationale of that opinion to be persuasive in the instant situation.

In *Doyle,* the plaintiffs alleged in their complaint that the fire which had destroyed their home could have been averted if fire hydrants near the scene would have yielded a stream of water to firemen. Specifically, the complaint averred that the defendant was negligent by allowing the water in crucial hydrants to freeze; by failing to inspect the hydrants; by failing to maintain sufficient water in the hy-

4. *Malter* is distinguishable from *Doyle* because in *Malter* the plaintiffs joined the municipality as a party defendant. The court ruled that both the water company and the municipality were obliged to answer the complaint filed against them.

drants; by failing to replace or repair inoperative valves; and *inter alia,* by failing to notify the Pittsburgh Fire Department that the hydrants were inoperative. The lead opinion, written by Justice Musmanno and joined by Justice O'Brien, held that the complaint stated a valid cause of action. Justice Roberts wrote a concurring opinion, joined by Justice Eagen, in which he agreed that the complaint stated a good cause of action because it alleged negligence "in the failure to inspect the hydrants and to replace or repair inoperative valves and in allowing the water in the hydrants to freeze." *Doyle, supra* 414 Pa. at 220, 199 A.2d at 885. Justice Jones wrote a dissenting opinion which was joined by Justice Cohen.

"Whatever the effects of an opinion supported by less than a majority of those justices participating may be, there can be no doubt that when a majority of those justices participating join in the opinion, it becomes binding precedent on the courts of Pennsylvania." *Commonwealth v. Mason,* 456 Pa. 602, 604, 322 A.2d 357, 358 (1974); *see Commonwealth v. Silverman,* 442 Pa. 211, 275 A.2d 308 (1971). In *Doyle,* it is clear that a majority of the justices joined in the opinion that the complaint stated a valid cause of action in so far as it alleged negligent failure on the part of the water company to maintain its system in "proper working condition." *Githens, Rexsamer & Co. v. Wildstein, supra* 443 Pa. at 483, 277 A.2d at 158. In the instant case, the complaint averred, *inter alia,* that the City failed to maintain its system in adequate operating condition. If proven, this allegation of negligence exemplifies the type of conduct for which liability could be imposed under the *Doyle* precept. We believe therefore that this case is distinguishable from the *Grant* and *Thompson* cases in the same respect as the *Doyle* case. As Justice Musmanno explained in *Doyle:*

"[I]n the *Thompson* case, the Court proceeded on the theory that undertaking the task of supplying water to the plaintiff, as in *Grant v. Erie, supra,* was discretionary with the municipality and that therefore it could not be held liable for failing to exercise a discretionary duty.

The plaintiff's claim in the *Thompson* case was based on the insufficiency of available hydrants near the plaintiff's property and the court viewed the claim as being one of a breach of duty to supply water. Here the situation is entirely different. The plaintiffs are not relying on the defendant's breach of duty to supply water but on its breach of a duty to use reasonable care in the operation and maintenance of a water system which the defendant had in fact set up in the vicinity of the plaintiffs' property.

Thus, the water company is not charged with the failure, through the municipality, to perform an act, which the court in the *Thompson* case said was a discretionary act. The municipality here did exercise its discretion and no one challenges that exercise. As a result of the fulfillment of that choice of action, hydrants were actually set up in the vicinity of the plaintiffs' property—five of them. Hence, the situation in the case at bar is far further advanced than the one outlined in the *Thompson* case. Discretion having been exercised and the physical fact of that exercise having become a fait accompli, reasonable care in the maintenance and repair of the planted hydrants became imperative. The failure to use that care is what the defendants are being charged with, not merely a breach of duty to supply water because of the defendant's contract with the municipality." *Doyle, supra* 414 Pa. at 206–07, 199 A.2d at 878.

■ Pitometer next contends that even if the City is held responsible for the proper maintenance of its water system, the case still should have been withdrawn from the jury because Printed Terry failed to present evidence which shows that the appellant was factually responsible *in any way* for closing the valves in District One. The record refutes this contention.

Viewed in a light most favorable to the verdict winner, the evidence clearly demonstrates that Pitometer was directly and inextricably involved with the City in making the decision to close the valves in District One north of the

Printed Terry plant. Virgil Ferguson, the district manager for Pitometer, testified that it was necessary to close the valves in District One in order to conduct the survey. After determining which valves had to be closed, Thomas K. Beane, the field engineer in charge of the Pitometer survey, discussed these closures, and their importance, with David Fink, who was the City superintendent of distribution and in charge of the City work crew assigned to perform the manual work needed for the survey.[5] The appellant argues that it cannot be held liable for the closure of the valves because the City exercised final authority in closing the valves. However, Pitometer's influence upon the decision-making process was amply illustrated at trial. Mr. Beane, in reference to the reports of low water pressure in the Printed Terry district received by the City prior to April 30, declared that "Mr. Fink *and I* determined that *we* needed another feed to that south area and that could be accomplished by opening the -12-inch valve on Eighth Street." (NT 558a) Mr. Beane later reaffirmed his statement. (NT 570a) Moreover, Mr. Beane not only suggested and advised which valves were to be closed, he personally viewed the actual closures in order to be sure that the manual laborers had completely closed the valves. We find that the evidence was sufficient to enable a reasonable man to conclude that the appellant was factually involved with the City in causing the valves to be closed.

■ The appellant, citing the *Restatement (Second) of Agency* § 352 (1958), next contends that it owed no duty to Printed Terry, as a third person, to perform adequately its contractual obligations with the City. We find the appellant's reliance upon Section 352 to be misplaced in the instant factual situation.

Section 352 of the *Restatement (Second) of Agency* provides that:

"An agent is not liable for harm to a person other than his principal because of his failure adequately to perform his

5. As previously noted, the City was required by contract to supply Pitometer with labor for operating valves and repairing leaks.

duties to his principal, unless physical harm results from reliance upon performance of the duties by the agent, or unless the agent has taken control of land or other tangible things."

Even assuming, arguendo, that the appellant was in fact an agent of the City,[6] Printed Terry based its cause of action not upon the contractual obligations between the appellant and the City, but upon harm caused it by alleged tortious conduct. *See Restatement (Second) of Agency* § 352, comment a at 123 (1958). Thus, the duty with which the appellant is charged with breaching was not a duty arising from its contract with the City, but rather a duty imposed by law. This case falls directly within the rule espoused by Justice Musmanno in *Doyle*: "[W]here a party to a contract assumes a duty to the other party to the contract, and it is foreseeable that a breach of that duty will cause injury to some third person not a party to the contract, the contracting party owes a duty to all those falling within the foreseeable orbit of risk of harm." *Doyle, supra* 414 Pa. at 207, 199 A.2d at 878; *see Prost v. Caldwell Store, Inc.,* 409 Pa. 421, 187 A.2d 273 (1963); *Restatement (Second) of Torts* § 324 A. (1965). This duty was also recognized by the supreme court in *Bisson v. John B. Kelly, Inc.,* 314 Pa. 99, 170 A. 139 (1934), where the court explained:

"It is a primary *social* duty of every person to take thought and have a care lest his action result in injuries to others. This social duty *the law* recognizes and enforces, and for any injury resulting from any person's lack of elementary forethought, the law holds that person accountable." *Id.* 314 Pa. at 110, 170 A. at 143.

■ The appellant next contends that the proof presented at trial by Printed Terry was legally insufficient to warrant the submission of the question of negligence to the jury, arguing specifically that it could not have anticipated or

6. The lower court, in its opinion, stated that the appellant was an independent contractor, not an agent. Such a determination, however, is not material to a finding that the appellant owed a duty of care to the plaintiff. The trial judge was therefore correct in not allowing such an issue to go to the jury.

foreseen the likelihood of harm to Printed Terry resulting from its actions in conducting the survey. In evaluating this argument, we must, of course, read the evidence in the light most favorable to the verdict winner. *E.g., Davies v. McDowell National Bank*, 407 Pa. 209, 180 A.2d 21 (1962).

Under Pennsylvania law, it is recognized that:

"A normal human being is held to foresee those injuries which are the consequences of his acts of omission or commission which he, as a reasonable human being, should have foreseen. The question whether a person charged with negligence or negligent acts or omissions should have foreseen the injuries resulting from those acts or omissions is for the jury, if there is any credible evidence from which a reasonable conclusion can be drawn in support of the claim of neglect of duty." *Bisson v. John B. Kelly, Inc., supra* 314 Pa. at 110, 170 A. at 143.

The evidence shows that the appellant is an engineering firm which specializes in analyzing municipal water systems. The appellant is often required to define and isolate distribution districts within a water system. It is common knowledge to all engaged in the appellant's profession that the isolation of a district will cause a reduction in the water pressure in an adjacent district. If the water pressure is reduced within a district, then the risk of fire damage within that district is greatly increased because most, if not all, district consumers rely upon the water system to provide water pressure sufficient to fight fires. Certainly, fires are not unforeseeable. "Unfortunately, fires are always possible, and the purpose of a fire hydrant, like a Minute Man, is to be ready for fires at all times." *Doyle, supra* 414 Pa. at 205, 199 A.2d at 877.

For theses reasons, engineering standards have developed which require that emergency crews be positioned near closed valves,[7] that local fire departments be notified that water pressure will be lowered, and that the effect of isolation upon adjacent districts be measured before a dis-

7. Several witnesses testified that closed valves may be opened within minutes.

trict is isolated. Here, the appellant began its performance under the contract, advised and directed the City to isolate District One, supervised the valve closures, yet failed to assure that the established safety practices of its trade were followed. Printed Terry was thereby clearly subjected to an increased risk of harm by fire. We find that the evidence was sufficient to allow the jury to determine the question of negligence.

The appellant next contends that even if it was negligent in performing the survey, the case should not have gone to the jury because the appellant could not be held legally responsible to anticipate the negligence of the City. This argument is without merit.

■ Assuming that the City did act negligently, as found by the jury, such conduct was not a matter of speculation for the appellant. The City acted in direct response to the stated needs of the appellant, which knew that the City was going to close the valves without following established standards. The appellant even participated in the closures. It is well established that "the duty to take precautions against the negligence of others arises, of course, only where a reasonable man would recognize the existence of an unreasonable risk." *W. Prosser, Law of Torts* § 49, at 140 (1955); *Restatement (Second) of Torts* § 302 A (1965). The evidence reveals that the appellant, an expert in the field, was aware that the closure of the valves in District One would reduce the water pressure in the Printed Terry district, and thereby greatly increase the risk of harm by fire in that district. The appellant knew that the lives and property of those people residing in the Printed Terry district would therefore be subjected to a greater risk of danger. The risk involved was both foreseeable and great. We find no merit to the appellant's argument either in the facts or in the law.

We may also eliminate the question of proximate cause in the instant case. We are confronted here with a case where the negligence of the appellant concurred with the negligence of the City to cause the complained of damages to

Printed Terry. As the supreme court stated in *Burrell Twp. v. Uncapher*, 117 Pa. 353, 11 A. 619, (1887):

" 'If the defendant's negligence concurred with some other event (other than the plaintiff's fault) to produce the plaintiff's injury, so that it clearly appears that but for such negligence the injury would not have happened, and both circumstances are closely connected with the injury in the order of events, the defendant is responsible, even though his negligent act was not the nearest cause in the order of time. . . . The fact that the injury was caused by the joint negligence of the defendant and a stranger is, of course, no defense; and unless the person whose fault is relied upon by the defendant as an excuse, was subject to the direction of the plaintiff, his fault cannot properly be charged upon the latter.' " *Id.* 117 Pa. at 363–64, 11 A. at 621, *quoting Shearman & Redfield, Negligence*, §§ 10, 46; *accord, Coyne v. Pittsburgh Rwys. Co.*, 393 Pa. 326, 141 A.2d 830 (1958); *Stearns v. Mt. Lebanon Twp.*, 167 Pa.Super. 341, 74 A.2d 779 (1950); *Restatement (Second) of Torts* § 439 (1965).

█ The appellant next contends that the plaintiff was guilty of contributory negligence as a matter of law. We have reviewed the record and have found no evidence which indicates that the plaintiff was negligent. The lower court did not therefore err by refusing to allow this issue to go to the jury. *E.g.*, *Greet v. Arned Corp.*, 412 Pa. 292, 194 A.2d 343 (1963); *Hepler v. Hammond*, 363 Pa. 355, 69 A.2d 95 (1949).

We affirm the lower court's refusal to grant the appellant's motion for judgment n. o. v.

### Pitometer's Motion for a New Trial

█ The appellant first asserts that a new trial is required because of the biased and prejudicial conduct of the trial judge. The appellant is, of course, "entitled to a trial before an impartial jury uninfluenced by the court's having shown favoritism or ill-temper towards either side." *Downey v. Weston*, 451 Pa. 259, 270, 301 A.2d 635, 642 (1973).

However, we have reviewed the extensive [8] record before us, as we must, *Russell v. Helm's Express, Inc.*, 221 Pa.Super. 292, 293 A.2d 78 (1972), and have found no support for the appellant's claim that the trial judge's conduct was partial or prejudicial.

The appellant next contends that the court below erred by admitting into evidence the plaintiff's exhibits 1 and 50. Exhibit 1 was the written report sent by the Lebanon Fire Chief, Stanley Strauss, to the City's Director of the Department of Public Safety, Mr. James T. Reilly, detailing the activities of the City Fire Department at the Printed Terry fire. Chief Strauss was required to submit such a report in fulfillment of his duties as Fire Chief. (NT 372a) This particular report was prepared by Chief Strauss within five days of the fire and was based upon handwritten notes, exhibit 50, which Chief Strauss had made soon after the fire.

■ Although the appellant offered these exhibits into evidence under the Uniform Business Records as Evidence Act, Act of May 4, 1939, P.L. 42, No. 35, §§ 1–4 (28 P.S. §§ 91a–d),[9] the record clearly shows that Chief Strauss, by no means a disinterested witness, had been extremely reluctant to testify prior to being confronted with these writings. The court below admitted the exhibits only after Chief Strauss testified that the writings embodied his recollection of the critical events, and thereby adopted them as substan-

8. The opinion of the lower court highlights this point. "The trial lasted nine (9) full days. There were a total of thirty-five (35) witnesses. The plaintiff produced one hundred forty (140) exhibits and the defendant produced eighty-two (82) exhibits." We may add that the printed record before us, on the matter of liability alone, encompasses 1261 pages.

9. The Uniform Business Records as Evidence Act states in pertinent part:
"A record of an act, condition or event shall, in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission." Act of May 4, 1939, P.L. 42, No. 35, § 2 (28 P.S. § 91b).

tive evidence. We find no error in the admission of these exhibits into evidence. Chief Strauss, the author of the writings, testified at trial as to the veracity of the statements contained therein. Moreover, he was subjected to vigorous cross-examination as to the contents and the conclusions in the writings. The admission of these exhibits were proper or, at most, harmless error. *See Brennan v. St. Lukes' Hospital*, 446 Pa. 339, 285 A.2d 471 (1971); *Githens, Rexsamer and Co. v. Wildstein*, 428 Pa. 201, 236 A.2d 792 (1968).

 The following colloquy occurred during the direct examination of Chief Strauss:

"Q. Did you discuss the report that you were going to make, before you made it, for your activities on the scene with Mr. Kinash, who was the head of the Water Department?

A. No, sir, I did not.

Q. No, I didn't.

MR. COZEN: Your Honor, at this time I'm going to ask leave to lead the witness, because I'm surprised by his last answer, in accordance with depositions that were previously taken in this case, sir." (NT 374a)

The lower court then allowed the plaintiff to ask Chief Strauss leading questions so as to elicit a response to counsel's question. The record shows that after a few questions, Chief Strauss' memory was refreshed, and counsel completed his examination as if on direct. The appellant, however, citing *Goodis v. Gimbel Bros.*, 420 Pa. 439, 218 A.2d 574 (1966), contends that the lower court failed to instruct the jury that the witness' prior inconsistent statement could be considered by the jury only for the purpose of evaluating Mr. Strauss' credibility and not as substantive evidence. We find the *Goodis* decision to be inapposite to the instant situation.

In *Goodis*, the appellant's counsel requested the lower court to instruct the jury that the reading of a witness' prior statement was not for the purpose of establishing the truth of what was said in the statement. The appellant's counsel

in the case at bar failed to make such a request of the trial judge. Moreover, we fail to see how the appellant was harmed by the partial reading of the deposition because the witness adopted as substantive evidence all the facts revealed thereby when he confirmed the veracity of the contents of his official report.

The appellant next contends that the conduct of plaintiff's counsel was so prejudicial as to require a new trial. We agree, in part, with this contention.

The record shows that after a verdict as to liability had been rendered in open court, the court below discharged the jury for the weekend. As the jurors left the courtroom, they entered an adjacent corridor, where one of the jurors, Mrs. Artz, was seen in contact with Mr. Stanley Katz, Esq., a partner in the law firm representing the plaintiff.[10] At the start of the trial for damages, the appellant requested a mistrial as to the entire case on the basis of the Katz incident. The lower court heard testimony from two witnesses.

Mr. Nicholas Moehlmann, Esq., an attorney employed by the law firm representing the appellant, but not a participant in the trial, testified that he did not see the origin of the contact, but he did observe Mr. Katz "either shaking the juror's hand or holding it in some fashion, and he was very close to her face, either kissing her . . . on the right cheek or whispering in her right ear. I couldn't tell exactly what he was doing." (NT 67a) Mr. Moehlmann further testified that he saw Mr. Katz with the juror for a period of about four seconds, but didn't "know how long that contact was going on before [he] observed it." (NT 67a) Although he was able to perceive that Mr. Katz and Mrs. Artz were conversing, he could not hear the content of their conversation.

Mr. James Reilly, Esq., a City councilman, testified that he saw Mr. Katz "shaking her hand in a sort of a long shake as she walked by the corridor . . . and he said something

10. Although Mr. Katz was a counsel of record for Printed Terry, he did not participate in the trial.

to the effect, I will see you next week, and she said, okay." (NT 137a) He testified that they conversed at longer length, but he could not hear what had been said. "The reason I knew what they said then is because it was said at a distance that was further up the corridor, and he sort of *yelled,* I will see you next week, and she said, okay." (NT 138a) (emphasis added) Mr. Reilly further stated that the incident lasted from "fifteen seconds to half a minute." (NT 139a)

Before Mr. Moehlmann testified, the following colloquy occurred at trial:

"MR. COZEN [plaintiff's counsel]: Would you like to have Mr. Katz in too, your honor?

THE COURT: Not now. The testimony of one witness will be enough for now."

At the conclusion of Mr. Moehlmann's testimony, the trial judge indicated his desire to have Mr. Reilly testify, and then suggested that Mrs. Artz be excused and that trial proceed with eleven jurors. Appellant's counsel refused to proceed with less than twelve jurors. The trial judge then stated: "I'll take the appropriate action after we have heard from all the parties involved. In the meantime, of course, your motion is refused at this time." (NT 69a) After Mr. Reilly testified, the lower court refused to declare a mistrial after the appellant again declined trial before eleven jurors. The trial as to damages continued. Neither Mr. Katz nor the juror was ever questioned.

Impartiality is the basis of our judicial system. In *Mix v. North America Co.,* 209 Pa. 636, 645, 59 A. 272, 274–75 (1904), the Supreme Court of Pennsylvania declared:

"It has been said that the greatest object of civil government is to get twelve honest men in the jury box. If this is true, after they get there they must be kept there, hedged around not only with their own integrity, but with every precaution against evil communication which may corrupt them; and when they go to their room to deliberate upon an issue in which is involved the life, liberty or property of their fellow man, their conduct in

the discharge of such solemn duty must comport with it, else confidence in the system which is the best achievement of civilization will be lost." See also Code of Professional Responsibility of American Bar Association, Ethical Consideration 7–29, 438 Pa. xxv (1970).

Public confidence in our judicial system can be maintained only if the integrity of that system is beyond question. Thus, the American Bar Association has proclaimed in Disciplinary Rule 7–108(B) of the Code of Professional Responsibility that:

"During the trial of a case: (1) A lawyer connected therewith shall not communicate with or cause another to communicate with any member of the jury (2) A lawyer who is not connected therewith shall not communicate with or cause another to communicate with a juror concerning the case." [11]

If, however, contact between an officer of the court and a juror should occur, "it is not required that [the parties] be curt or lacking in the customary amenities of social intercourse . . . ." *Pessin v. Keeneland Association,* 298 F.Supp. 593, 599 (E.D.Ky.1969). Such contacts, however, must not be of such a nature as to cast suspicion upon the integrity of the jury verdict. Thus, the Supreme Court of the United States, in *Mattox v. United States,* 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892), pronounced that:

"Private communications, possibly prejudicial between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear." *Id.* at 150, 13 S.Ct. at 53.

11. Lebanon County Rule of Court No. 225 states:
"No attorney, whether or not involved in the trial of a civil action, shall inquire directly or indirectly, or through any other person, or a juror as to how such juror voted or concerning any matter concerning the deliberations of the jury. No attorney shall make any comment to the jury following the rendition of the verdict.
If the ends of justice so require, the court may authorize the interrogation of any juror, but such authorization shall be granted only upon hearing and after notice to opposing counsel. The hearing may, if the circumstances warrant, be held in chambers."

We therefore agree with the statement of the court in *California Fruit Exchange v. Henry*, 89 F.Supp. 580, 588–89 (W.D.Pa.1950), that:

"The courts look with suspicion upon any communications between parties to a suit or their counsel and the jury impaneled to try it; and if such communication is had and it appears that a conversation was had about the suit, or *the communication is not explained satisfactorily*, it will, in itself, be ground for a new trial. If, when explained, however, it can be seen in the communication nothing was said about the case and nothing was done for the purpose of influencing the mind of the jury, and that the communication or conversation had no influence on the verdict which was reached, no ground exists to set the verdict aside for the reasons that said comment could not have been prejudicial." (emphasis added)

We find that the communication between Mr. Katz and Mrs. Artz was described and verified, but not explained, by the testimony adduced at trial. There is no evidence on the record from which we can conclude that the conversation had no influence on the verdict which was reached as to damages. All that we can determine from the record is that contact took place. We do not know, and the trial judge could not have known, the content of the conversation or that it was not intended to, or did not, influence either Mrs. Artz or other jurors who were possibly watching or listening. In such a situation, the law clearly demands that a new trial be granted. The integrity of a jury verdict must be beyond reproach. The record, however, reveals that the incident could not have prejudiced the appellant in regard to the verdict as to liability. The liability verdict had already been rendered in open court and the jury discharged before the incident occurred. A new trial is therefore granted solely as to the issue of damages.

The determination to grant or refuse a mistrial because of alleged improper conduct on the part of counsel is solely within the discretion of the trial judge. *E. g., Mix v. North America Co., supra.* However, if a counsel communi-

cates with a juror and the harmlessness of such contact is not demonstrated, a mistrial must be declared. The trial judge in the case at bar refused to call to the witness stand either Mr. Katz or the juror, who were apparently the only two people who could explain the incident in question. In so doing the trial judge overrode the requirements of the law, and thereby abused his discretion. *Cf. Levy v. Levy,* 240 Pa.Super. 168, 361 A.2d 781 (1976), and cases cited therein. Even if the trial judge had called Mr. Katz and the juror to the stand, we are skeptical that a satisfactory explanation would have resulted. The testimony demonstrates that the incident involved more than an unavoidable and momentary courtesy, discreet in nature. However, we are not required to rule upon this question in the instant case.

The appellant contends that the restriction of a new trial to the issue of damages alone is a denial of its right to a trial by jury under the Pennsylvania constitution. Article One, Section Six of this Commonwealth's constitution provides: "Trial by jury shall be as heretofore, and the right thereof remain inviolate. The General Assembly may provide, however, by law, that a verdict may be rendered by not less than five-sixths of the jury in any civil case." The appellant, citing *Gasoline Products Co. v. Champlin Refining Co.,* 283 U.S. 494, 51 S.Ct. 513, 75 L.Ed. 1188 (1931), argues that under the common law in force when the section was adopted no verdict could be set aside in part; if a verdict was erroneous as to any issue, then a new trial was directed as to all. Therefore, the appellant concludes, a grant of a new trial as to damages alone is a denial of its right to a trial by jury as constitutionally guaranteed.

The appellant's argument is correct in part. The courts of this Commonwealth have often held that this section must be construed with reference to the statutes and practices that were in force at the time of the adoption of the first state constitution. *E. g., Rhines v. Clark,* 51 Pa. 96 (1866); *Byers and Davis v. Commonwealth,* 42 Pa. 89 (1862); *Scranton v. Hollenberg,* 152 Pa.Super. 138, 31 A.2d 437 (1943).

Also, "the granting of a new trial limited to the issue of damages was not permissible under the common law." *Troncatti v. Smereczniak*, 428 Pa. 7, 9, 235 A.2d 345, 346 (1967). However, it is well established that the cardinal principle of this section is that " 'the *essential features* of trial by jury as known at the common law shall be preserved. The fundamental law preserves the substance of the right; details of administration which leave the enjoyment of the right unaffected are of no constitutional concern.' " *Commonwealth v. Eckhart*, 430 Pa. 311, 315, 242 A.2d 271, 273 (1968), *quoting Commonwealth v. Fugmann*, 330 Pa. 4, 28, 198 A. 99, 111 (1938). Recognizing that the Constitution is concerned with substance, and not form, the Pennsylvania Supreme Court, and most jurisdictions, have allowed limited new trials in certain circumstances. *See Troncatti v. Smereczniak, supra*, and cases cited therein. The United States Supreme Court, in *Gasoline Products Co. v. Champlin Refining Co., supra* at 499, 51 S.Ct. at 515, ruled that "where the requirement of a jury trial [under the 7th Amendment] has been satisfied by a verdict according to law upon one issue of fact, that requirement does not compel a new trial of that issue even though another and separable issue must be tried again." [12]

In *Gagliano v. Ditzler*, 437 Pa. 230, 232–33, 263 A.2d 319, 320 (1970), the supreme court noted that a lower court may grant a new trial, limited to the issue of damages, *"only* where (1) the question of liability is not intertwined with the question of damages, *and* (2) the issue of liability is either (a) not contested or (b) has been fairly determined so that no substantial complaint can be made with respect thereto." (citations omitted) Here, the question of liability was not intertwined with the question of damages and was fairly

12. The 7th Amendment provides:
"In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law."

determined at trial. We affirm the order of the court below [13] granting a new trial limited to the issue of damages.

In view of the disposition of this case, and the discussion herein, we need not singularly assess the allegations of error raised by Printed Terry that the lower court improperly granted a new trial as to damages and improperly refused to mold, modify and amend the verdict as to damages.

The order of the lower court dated August 12, 1975, is affirmed.

13. It should be noted that the trial judge retired after the conclusion of the trial and was not a member of the reviewing court.