518 A.2d 1206

James R. COLOSIMO, Individually and t/d/b/a Kinzua Korners and Safari Lounge, Appellee,

v.

PENNSYLVANIA ELECTRIC COMPANY, Appellant,

v.

Lamont E. EDEL and Frank Cardamone, Appellees.

Lamont E. EDEL and Sandra Kay Edel, Appellees,

v.

PENNSYLVANIA ELECTRIC COMPANY, Appellant,

v.

Lamont E. EDEL, James R. Colosimo and Frank Cardamone, Appellees.

Supreme Court of Pennsylvania.

Argued Sept. 17, 1986.

Decided Dec. 23, 1986.

156

John M. McLaughlin, Knox Graham McLaughlin Gornall & Sennett, Inc., Erie, William J. Kubiak, McDowell, McDowell, Wick & Daly, Bradford, for appellant.

Richard W. Mutzabaugh, Bradford, Paul H. Titus, Pittsburgh, for Colosimo & Edel.

William McVay, Bradford, for Lamont Edel.

David W. Swanson, Swanson, Bevevino and Millin, P.C., Warren, for appellees.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

HUTCHINSON, Justice.

Appellant, Pennsylvania Electric Company (Penelec), appeals by allowance an order of Superior Court sitting *en banc* which affirmed a McKean County Common Pleas order granting appellee's motion for a new trial. 337 Pa.Super. 363, 486 A.2d 1378. Common Pleas granted the new trial because one of the jurors selected had previously retained counsel for additional defendant Cardamone in an independent matter and met with counsel on that matter during the trial in violation of the trial judge's express prohibition of such contacts. We disapprove the empaneling of any juror who is currently represented by trial counsel in any matter without regard to contact between trial counsel and that juror during the trial. Any contact under such circumstances must be viewed as highly improper and the basis for a new trial if there is any likelihood of prejudice. On this record, we cannot conclude that the

attorney's client, Cardamone, in whose favor the jury returned a general verdict of no liability, did not benefit from his lawyer's relation with the juror. Therefore, we cannot rule out prejudice to the plaintiffs, whose case against Penelec was rejected by the jury. Accordingly, we hold that the trial court did not abuse its discretion by granting a new trial and we affirm Superior Court.

On June 17, 1977, a commercial complex [1] located in Lafayette Township, McKean County, owned by appellee James R. Colosimo and occupied by appellees Lamont E. Edel and Sandra Kay Edel, burned down. It was completely destroyed. In separate suits, Colosimo and the Edels sued Penelec. They alleged that the fire was caused by the negligence of Penelec's employees. Penelec, in turn, joined Frank Cardamone, the electrician who wired part of the complex, as an additional defendant. [2] Penelec claimed that the fire was caused, at least in part, by the negligence of Cardamone and the appellees themselves. The cases were consolidated for trial.

Cardamone was represented by Jay Paul Kahle. Kahle is a well known local attorney; he is also the elected district attorney of McKean County. Appellant argues that Cardamone had a close relation with the plaintiffs from which he infers Cardamone and the plaintiffs had a common interest hostile to appellant. The record shows some evidence of a relation between Cardamone and the plaintiff and cooperation between them in the litigation. Cardamone was friendly with the Edels and Colosimo, and Colosimo hired him to do electrical work at the complex from time to time. Colosimo and the Edels had not chosen to sue Cardamone; Penelec joined him as an additional defendant. Accordingly, all parties except Penelec and their attorneys met in Kahle's office to plan trial strategy after each day's proceedings.

1. The complex included a restaurant, Kinzua Korners, a bar, The Safari Lounge, a gift shop, a sporting goods store, an apartment and a storage trailer.

2. Penelec also joined Colosimo and the Edels as additional defendants in the Edels' suit and the Edels as additional defendants in Colosimo's suit.

Despite these meetings, it is obvious that Cardamone had a common interest with Penelec in obtaining a verdict against plaintiffs which would obviate any secondary liability on its part. The jury rendered a general verdict against the plaintiffs for both the defendant and the additional defendants.

Twelve jurors and two alternates were chosen on October 2, 1979 for the trial which began on April 8, 1980. It is normal practice in McKean and other rural counties to choose the jury long before trial. When the case was called, two jurors were excused and replaced by the alternates. This left the empaneled jury without alternates.[3]

In late January or early February, after the jury was selected but before the trial began, one of the jurors, Jay E Chapman, Jr., retained Kahle to administer the estate of his recently deceased mother. Chapman was the executor. He had consulted with Kahle when his father died a year earlier. Apparently neither man associated the other with the trial.

· At the conclusion of the trial's first day, April 8, Kahle informed the court, parties and counsel about his representation of Chapman. He stated that he did not realize that Chapman had been chosen as a juror in this matter until the trial began. In spite of this relationship, the parties agreed to go forward with the trial.[4] Had any party objected, the trial would have been continued until the next term because the complement of alternate jurors had been exhausted. This delay, in part, influenced the decision to go ahead. On April 8, 9 and 11 the court, in plain and stern terms, instructed the jurors to avoid any and all contact with persons involved in the case. N.T. April 8, 1980 at 3; April

3. The problems incident to this case suggest to us that some modification of the jury selection method is advisable in this county. Selection of a panel at a time closer to the trial date along with provision for additional alternates who can be sent home if not needed may be of help. If no solution is reached locally, this Court may be required to exercise its general supervisory power to correct the situation.

4. This conversation occurred off the record. The only evidence of it is contained in Kahle's deposition. However, no party disputes that it was informed and agreed to proceed.

9, 1980 at 381; April 11, 1980 at 549. The jury found that the fire was caused by an accident and exonerated Penelec and all other parties of liability on April 25, 1980.

After the conclusion of the trial, Colosimo and the Edels learned about contact that occurred during the trial between Kahle and juror Chapman. During the trial, one of Kahle's employees, Rose Elliott, called Chapman and asked him to come to the office and sign some papers for his mother's estate. The papers were inheritance tax papers. Kahle thought they required filing during the trial if the estate were to qualify for the five percent discount granted for paying inheritance taxes within three months of death. 72 Pa.C.S. § 1742 (appendix). Chapman appeared at Kahle's office on April 18, 1980. He claims that Kahle met with him for a few minutes and explained the papers to him before he signed them. Deposition of Jay E. Chapman, Jr., September 10, 1980 at 8. However, he said they did not discuss this case. Chapman asked if their meeting was okay; Kahle told him that it was. *Id.* at 19. Kahle's version is somewhat different. He admitted that his secretary brought the approaching tax deadline to his attention, and he told her to ask Chapman to come to the office to sign the necessary papers. Deposition of Jay Paul Kahle, September 10, 1980 at 5. He remembers meeting Chapman on the sidewalk outside of his office on April 18 but said he did not talk with him. *Id.* at 10. He had no recollection of meeting with Chapman in his office to explain the papers on that day or any other time during the trial. *Id.* Kahle stated that he did not inform the court that Chapman came to his office to sign these papers because he did not think that it was necessary. *Id.* at 9, 11–12. Both of Kahle's secretaries corroborated his story. Neither could recall a meeting between the two men on April 18. Deposition of Bonnie Semmel, September 10, 1980 at 4; Deposition of Rose Elliott, September 10, 1980 at 14–15, 26. Chapman and Kahle were compensated by the estate for services rendered. Deposition of Jay E. Chapman, Jr., *supra* at 12–13; Deposition of Jay P. Kahle, *supra* at 7.

Colosimo and the Edels filed a supplemental motion for new trial on July 10, 1986.[5] They alleged that Kahle's contact with Chapman prejudiced the jury and the outcome of the trial. Common Pleas agreed and granted the motion. It relied on *Printed Terry Finishing v. City of Lebanon*, 247 Pa.Superior Ct. 277, 372 A.2d 460 (1977), and Disciplinary Rule 7–108(B)[6] of the Code of Professional Responsibility in reaching its decision.

On appeal, a divided Superior Court panel reversed Common Pleas. It cited the same authority but held that the contact was harmless and had no effect on the jury's verdict. Thus, it held that the lower court abused its discretion in granting the plaintiffs a new trial. The case was subsequently reargued before Superior Court sitting *en banc*. An equally divided court[7] affirmed the order granting a new trial. The opinion in support of affirmance stated that the contact between the attorney and the juror may not have been prejudicial. However, a new trial was necessary to protect the jury system from the appearance of impropriety. The Opinion in Support of Affirmance also relied on *Printed Terry*, *supra*, and Disciplinary Rule 7–108(B).

Contact between jurors and other parties, court officers, lawyers and judges is viewed with disfavor. The impartiality and integrity of the jury are critical to the properly functioning of our system. Indeed, the jury is its keystone.

5. Penelec argued to Superior Court that the motion for new trial should have been dismissed as untimely under Pa.R.C.P. 227.1. The court ignored that argument and disposed of the case on its merits. Penelec has not presented this argument to us.

6. Disciplinary Rule 7–108(B) reads:
   (B) During the trial of a case:
      (1) A lawyer connected therewith shall not communicate with or cause another to communicate with any member of the jury.
      (2) A lawyer who is not connected therewith shall not communicate with or cause another to communicate with a juror concerning the case.

7. Two judges joined Judge (now President Judge) Cirillo's Opinion in Support of Affirmance; then President Judge Spaeth filed an Opinion in Support of Remand; the remaining three judges joined the two Opinions in Support of Reversal.

As we stated in *Mix v. North American Co.,* 209 Pa. 636, 59 A. 272 (1904):

> It has been said that the greatest object of civil government is to get twelve honest men in the jury box. If this is true, after they get there they must be kept there, hedged around not only with their own integrity, but with every precaution against evil communication which may corrupt them; and when they go to their room to deliberate upon an issue in which is involved the life, liberty or property of their fellowman, their conduct in the discharge of such solemn duty must comport with it, else confidence in the system which is the best achievement of civilization will be lost.

*Id.,* 209 Pa. at 645, 59 A. at 274–75. To this end, we go to great lengths to protect the jury and guard against juror bias. Through the *voir dire* process individuals with bias or a close relationship to the parties, lawyers or matters involved are ferreted out and excluded. Once chosen, jurors take an oath to decide the case based only on the evidence. 7 Pennsylvania Standard Practice 2d § 47.44 (1982). They are customarily instructed not to discuss the case with anyone and to avoid contact with media covering the case. *See* Pennsylvania Suggested Standard Civil Jury Instructions 1.00 (1981). In certain sensitive cases, jurors are sequestered for the duration of the trial, at Commonwealth expense, and insulated from the influence of the outside world. A party who doubts that an unbiased jury can be found in the county where the suit is filed may move for a change of venue to another county. Pa.R.C.P. 1006(d)(2); Pa.R.Crim.P. 312. A juror whose bias is uncovered later may, in certain circumstances, be removed even after the jury is sworn. *Commonwealth v. Jerry,* 485 Pa. 95, 401 A.2d 310 (1979). *See generally* 7 Pennsylvania Standard Practice 2d § 47.32 (1982) (time for challenging juror's competency). In addition, it is a crime for any person to contact a juror to influence his vote in a case, 18 Pa.C.S. § 5102, or even eavesdrop on the jury's deliberations. 18 Pa.C.S. § 5103. Both legal and judicial codes of ethics proscribe *ex parte* contact with jurors. Code of

Professional Responsibility, DR 7–108(B), EC 7–29 (1986); Code of Judicial Conduct, Canon 3(A)(4) (1986).

While the motion for a new trial is not for the specific purpose of preserving the integrity and impartiality of the jury system, that integrity is plainly relevant to the motion's general purpose, preventing injustice. A new trial should be granted if the judge finds that an injustice has been done. *Thompson v. City of Philadelphia,* 507 Pa. 592, 493 A.2d 669 (1985); *Austin v. Ridge,* 435 Pa. 1, 255 A.2d 123 (1969). Among the recognized reasons for granting a new trial is misconduct by counsel, *Trimble v. Merloe,* 413 Pa. 408, 197 A.2d 457 (1964).[8] The power to grant a new trial is inherent in the court, and the decision to grant or deny a motion for new trial rests within its sound discretion. *Smalich v. Westfall,* 440 Pa. 409, 269 A.2d 476 (1970); *Kralik v. Cromwell,* 435 Pa. 613, 258 A.2d 654 (1969). The court's decision will not be disturbed on appellate review absent an abuse of that discretion. *Thompson v. City of Philadelphia, supra; Commonwealth v. Pronkoskie,* 498 Pa. 245, 445 A.2d 1203 (1982). These basic concepts provide the starting point for addressing the situation before us.

Review of our cases involving *ex parte* jury contact analogous to contact with counsel for one of the parties shows that the trial court is not authorized to grant a new trial unless prejudice to the moving party was likely from the contact. We most recently expressed this principle in *Commonwealth v. Bradley,* 501 Pa. 25, 27, 459 A.2d 733, 734 (1983) (harmless contact between judge and jury).[9]

---

**8.** In passing, we note that mere violation of Disciplinary Rules of the Code of Professional Responsibility does not provide the basis for a new trial. The underlying conduct which constitutes a violation of the Code may, however, also cause "a reasonable likelihood of prejudice" warranting a new trial. The Code itself provides standards for attorney conduct, the violation of which may be a basis for attorney discipline.

**9.** *See also Morrissey v. Department of Highways,* 440 Pa. 71, 269 A.2d 866 (1970) (conversation between juror and witness held innocuous); *Cohen v. Lancaster Redevelopment Authority,* 425 Pa. 441, 229 A.2d 744 (1967) (conversation between jurors and officer of condemnor unwise but innocuous); *Nyce v. Muffley,* 384 Pa. 107, 119 A.2d 530

Consistent with these analogous situations, we will not adopt a *per se* rule that any contact between a juror and an attorney or a juror and a party requires a new trial. That would eliminate the discretion inherent in a court's power to grant a new trial and could require a new trial even in the absence of injustice. Here, the trial judge has found an injustice which led him to grant a new trial. The record is certainly sufficient to support him. This case involved not only contact, but contact within a current professional relationship between the trial counsel and the juror. We condemn it.

We recently eliminated a *per se* rule in a related context: contact between judges and jurors. Previously, any *ex parte* contact between a juror and a judge, no matter how innocuous, required a new trial. *Argo v. Goodstein,* 424 Pa. 612, 228 A.2d 195 (1967). However, we overruled *Argo* in *Commonwealth v. Bradley, supra,* and required the moving party to show "[a] reasonable likelihood of prejudice." *Id.,* 501 Pa. at 36, 459 A.2d at 739.

> The reason for prohibiting a trial judge from communicating with a jury ex parte is to prevent the court from unduly influencing the jury and to afford counsel an opportunity to become aware and to seek to correct any error which might occur. Where there is no showing either that the court's action may have influenced the jury or that its directions were erroneous, then the reason for the rule dissolves.

*Id.,* 501 Pa. at 37, 459 A.2d at 739 (emphasis and citations omitted) (quoting *Yarsunas v. Boros,* 423 Pa. 364, 368, 223 A.2d 696, 698 (1966) (Roberts, J. dissenting)).

■ Superior Court's formulation of the rule governing contacts between jurors and parties or their counsel in

(1956) (receiving clerical instructions from tipstaff after verdict was decided not prejudicial); *Paustenbaugh v. Ward Baking Co.,* 374 Pa. 418, 97 A.2d 816 (1953) (plaintiff's wife told three jurors about her husband's problem in the washroom; they immediately informed the judge who, after an in-chambers examination, found no prejudice).

*Printed Terry Finishing v. City of Lebanon, supra,* on which the lower courts here relied, is consistent with the foregoing.

> The courts look with suspicion upon any communications between parties to a suit or their counsel and the jury impaneled to try it; and if such communication is had and it appears that a conversation was had about the suit, or the communication is not explained satisfactorily, it will, in itself, be ground for a new trial. If, when explained, however, it can be seen in the communication nothing was said about the case and nothing was done for the purpose of influencing the mind of the jury, and that the communication or conversation had no influence on the verdict which was reached, no ground exists to set the verdict aside for the reasons that said comment could not have been prejudicial.

*Id.,* 247 Pa.Super.Ct. at 299, 372 A.2d at 471 (emphasis omitted) (quoting *California Fruit Exchange v. Henry,* 89 F.Supp. 580, 588–89 (W.D.Pa.1950)). Thus, when a communication or contact has occurred between an attorney and a juror, the judge may, within his discretion, infer prejudice. To rebut the inference, the communication must not only be explained but explained and shown harmless.

■ The judge here acted within his discretion in finding that the contact between Chapman and Kahle was prejudicial and granting the plaintiff's motion for a new trial. Though the contact has been explained, it has not been shown to be harmless under the evidence presented in the record and the depositions of Kahle, Chapman and the secretaries. That evidence shows that Chapman and Kahle entered into an attorney-client relationship before the trial began. It continued during and after the trial. The relationship was disclosed at the start of the trial. The problem was not removed by the parties' agreement to go ahead. Indeed, we question the court's wisdom in permitting the parties to agree to a procedure fraught with such obvious potential for injustice.

That potential was not removed when the court cautioned the juror to avoid contact with all individuals and counsel involved in the case. Subsequently, Kahle concluded that unless the inheritance tax forms were filed, his client would lose the five percent discount for prompt filing. He told his secretary to ask Chapman to come to the office and sign the necessary forms. It was in the financial interest of both men to get the discount. The juror passed the attorney as he left the office. Perhaps they only exchanged pleasantries and did not discuss the case. This may have all been innocent and the contact a result of mischance. Both men received checks from the estate for discharging their respective duties as attorney and executor. The episode was not revealed to the court.

The lawyer and the juror had a continuing, active professional relationship. It makes no difference that the contact may have occurred through employees rather than the attorney personally, as one version of the testimony could show. Both men benefited financially from this relationship. These facts do not show a situation which is obviously innocent or harmless. We cannot discount the effect of this contact due to the asserted odd alignment of Kahle's client with the plaintiff. The interests of Kahle's client, Cardamone, were at least in part allied with the original defendant Penelec. A biased juror could easily assume that he would best benefit Kahle by finding none of the defendants at fault.

Although this result may seem unfair to Penelec, the trial judge, who is in the best position to determine such matters, concluded that justice required a new trial as to all parties. This is equivalent to holding that the whole trial was tainted. We see no abuse of discretion in this respect.

The order of Superior Court is affirmed.

PAPADAKOS, J., joins in this opinion and files a concurring opinion.

McDERMOTT, J., files a concurring opinion.

ZAPPALA, J., concurs in the result.

McDERMOTT, Justice, concurring.

Under the facts of this case, where an empaneled juror had an ongoing professional relationship with one of the participating attorneys, I have no hesitation in concluding that a new trial is required. However, I hesitate to extrapolate any far-reaching rule from this case, and say only that future cases should be likewise judged on their individual facts and circumstances.

PAPADAKOS, Justice, concurring.

I join with the Majority in affirming the Superior Court order which affirmed the trial court's grant of a new trial. I write separately to express my view that we should establish a per se rule governing a situation where a trial counsel has an attorney-client relationship with a juror. In such cases, either the trial lawyer must withdraw from the case, or the juror must be removed by the court. If neither can be accomplished, then a new trial must be granted. Nothing less will insure the appearance of impartiality and maintain the integrity of the jury.

In the absence of such a prophylactic rule, the trial judge was faced with deciding between the rights of the parties to a fair and impartial jury on the one hand, and judicial convenience on the other hand. He opted for judicial expediency (presumably because of the agreement of all parties), but perhaps harboring the secret wish of all trial judges that the verdict would cure any defect. It did not happen here, and the parties are put to the expense and burden of retrying their case long after the events (1977) and following two appeals.